Estate of Martin M. Melcher, Deceased, Terrance Paul Melcher, Administrator, and Doris Day Melcher v. Commissioner.
Estate of Melcher v. Commissioner
Docket Nos. 73707, 92295.
United States Tax Court
T.C. Memo 1970-237; 1970 Tax Ct. Memo LEXIS 120; 29 T.C.M. (CCH) 1010; T.C.M. (RIA) 70237; August 24, 1970, Filed. *120 Issue 1: (a) Held, upon the facts: That petitioner, Martn Melcher, did not enter into a bona fide transaction in 1953 for the purchase of $3,000,000 Federal Land Bank bonds; the transaction was without substance; it was a sham; and cannot be recognized for tax purposes; that petitioner did not borrow and was not indebted for $3,156,000; that in reality he did not purchase the bonds; and that the amounts paid by petitioner to Gibraltar in 1953, 1954, 1955, 1956, and 1957 were not interest paid on indebtedness and, therefore, were not deductible under section 23(b), 1939 Code, and section 163(a), 1954 Code. (b) Held: That as the purported transaction was a sham, there shall be excluded from taxable income, under Rule 50, for 1953, 1954, 1955, 1956, and 1957 the amounts included in income as interest on the bonds and the capital gain from the purported sale in 1957. (c) Held, upon the facts: That a deduction is not allowable for petitioner's net expense in the transaction, $115,406.31, as a loss under either section 165(c)(2) or section 1234; the loss was not one sustained in a transaction entered into for profit, and it was not a loss attributable to failure to exercise an option to *121 buy or sell property as no such option was involved. Issue 2: (a) Held, upon the facts: That in the purchase in 1956 of the residential real estate which became the residence of petitioners, the purported resale of the property by 250 Building Co. to petitioners was lacking in substance and was a sham; that the Wallensteins sold the property to petitioners for $85,000; that Connoring Co. (also called 250 Building Co.) was merely a conduit through which petitioners' payments were made to the Wallensteins; that petitioners did not purchase the property from 250 Building Co. for $110,000; that petitioners were not indebted to the corporation for $80,000; and that petitioners' payments to 250 Building Co. in 1956 totaling $76,000 were not prepayments of interest on indebtedness, and are not deductible under section 163(a). (b) Held, upon the facts: That petitioners' payments totaling $76,000 represented payments of the following: (1) $50,000 on the purchase price of the property which they acquired for $85,000, and (2) $26,000 to reimburse the corporation for funds it advanced; and that the payment of $26,000 to 250 Building Co. represented reimbursement for its payments of cash for petitioners' *122 benefit totaling $10,236.80 at the closing of the sale by the Wallensteins; and a fee to the corporation of $15,763.20 for its services in providing the mechanics and appearance of a "purchase" by the corporation, a "resale" to petitioners, the basis for a purported "indebtedness" of $80,000, and the basis for a purported prepayment of "interest" of $76,000. Robert Forst and Morton Rosen, for the petitioners. Eli Blumenfeld and Myron Weiss, for the respondent. 1011 HARRON HARRON, Judge: Respondent determined the following deficiencies in income tax: Docket No.
Year
Deficiency
73707
1953
$ 64,527.96
1954
134,547.67
1955
94,488.80
92295
1956
120,478.89
1957 31,747.94
$445,791.26
The issues are: (1) Whether payments in each year in the following amounts were payments of interest on indebtedness within section 23(b), 1939 Code, and section 163(a), 1954 Code; and if not, whether they are deductible as losses, or otherwise: 1953
$ 86,998.25
1954
143,547.14
1955
117,447.66
1956
68,590.68
1957 63,155.91
$479,739.64 The above payments were made in connection with a transaction in $3,000,000 of Federal Land Bank bonds. (2) Whether a payment in 1956 of $76,000 was interest on indebtedness within section 163(a), 1954 *123 Code. The payment was made in connection with the purchase of residential real estate. Findings of Fact Martin M. Melcher and Doris Day Melcher, husband and wife, filed joint returns for the taxable years with the district director of internal revenue at Los Angeles, California. When the petitions in these cases were filed, they were residents of Beverly Hills, California. Melcher died, a resident of California, on April 20, 1968. Terrance Paul Melcher is the administrator of the decedent's estate, appointed by the Superior Court of California for Los Angeles County. Since the issues relate to transactions of Melcher during his lifetime, he is referred to herein as the petitioner. Such reference does not refer to the administrator of his estate. Issue 1: Federal Land Bank Bonds: Deductions for Payments of Alleged Interest Melcher was primarily a motion picture producer during the taxable years. Doris Day Melcher (Doris Day) is an actress and singer. In the transactions involving the Federal Land Bank bonds, Melcher was advised by Jerome B. Rosenthal, [1] his lawyer, and other members of Rosenthal's law firm, Rosenthal and Norton. Rosenthal was Melcher's exclusive business and financial *124 adviser, as well as his attorney, during the years involved. Rosenthal also was Doris Day's attorney, and he was a personal friend of the Melchers. Rosenthal's law firm was located at 242 North Canon Drive, Beverly Hills, during the earlier years involved, and later at 250 North Canon Drive. During 1958 and before, the name of the firm was Rosenthal and Norton. [2] The joint returns of the Melchers for each of the years 1953 through 1957 were prepared in the Rosenthal office. The address of the Melchers in the statutory deficiency notices and petitions in these cases is the same as that of Rosenthal's law office. Rosenthal advised Melcher that he could enter into a transaction, in March 1953, by placing an order with Cantor, Fitzgerald Co. (C-F), in Beverly Hills, a brokerage firm, to purchase for his account $3,000,000 Federal Land Bank bonds bearing 1 3/4 percent interest, under arrangements which would involve executing a note and making monthly payments of "interest" on the *125 note. Rosenthal was acquainted with B. Gerald Cantor, a principal member of the Cantor, Fitzgerald firm, and they arranged the transaction for Melcher, who did not participate in the various steps, except to follow Rosenthal's advice and to sign papers prepared for his signature. Melcher had not ever before negotiated or entered into a securities transaction representing such a large amount. Cantor advised Rosenthal and Melcher that its correspondent in New York City, The Gibraltar Financial Corporation, would participate in the transaction, and that the note would be payable to Gibraltar. Gibraltar carried out most of the steps in the transaction. Melcher was not informed about the various steps taken by Gibraltar and Cantor, Fitzgerald Co. Gibraltar was incorporated in New York early in 1953 (according to the record in these cases)(by Jack J. Bernstein, who accquired all of Gibraltar's stock for $2,000. Bernstein was a vice-president of C-F,- AND HE WAS A VICE-PRESIDENT AND DIRECTOR OF 1012 Gibraltar during 1953-1956. Thereafter, he became re-associated with C-F as a vicepresident. John Fitzgerald was the president and a director of Gibrltar during 1953-1956; he was a vice-president *126 of C-F prior to his employment by Gibraltar. Gibraltar was organized by former members of C-F in order to facilitate the carrying out of transactions resembling the one involved here, and there was a close connection between Gibraltar and C-F. The evidence does not show Gibraltar's working capital, cash position, net worth, or liquid assets in March 1953, or during the years involved. Gibraltar was not subject to the regulations of the Securities and Exchange Commission (SEC); and it was not a member of, or subject to the regulations of, the New York Stock Exchange. The following sets forth in summary the arrangements which are in issue, which began as of March 11, 1953; were concluded as of September 6, 1957; and were closed by a payment by Melcher on December 4, 1957, of $11,131.20. Hereiafter are several schedules. The transaction involved Cantor, Fitzgerald (C-F) in Beverly Hills, which acted as Melcher's broker, and its clearance agent in New York City, Chemical Bank & Trust Co.; Gibraltar in New York City and its clearance agent in New York, Irving Trust Co., where Gibraltar maintained an account; and C. F. Childs & Co., a securities dealer in New York City. 1. On March 11, 1953, *127 C-F purchased $3,000,000 Federal Land Bank bonds, bearing 1 3/4 percent interest, due October 1, 1957, callable October 1, 1955. The interest on the bonds was payable on April 1 and October 1, $26,250 on each date, $52,500 a year. The purchase price of the bonds was, at the market price of 95-14/32, $2,863,125. The broker's statement made out as a charge to Melcher, set forth a total charge of $2,888,333.34: Purchase price, 95-14/32
$2,863,125.00
Commission of C-F
1,875.00
Bond interest accrued to 3/11/53 23,333.34
Total charge
$2,888,333.34 Melcher did not make any, payment on account for this charge. 2. The bonds were in New York. On March 11, 1953, upon Gibraltar's order, C. F. Childs sold the bonds at 95-13/32 (1/32 of 1 point less than the purchase price) for the net amount $2,885,520.84, which was $2,812.50 less than the purchase price. Irving Trust handled this step. 3. The bonds were purchased and sold on March 11, 1953. The mechanics used were: C-F instructed Chemical Bank to deliver the bonds to Irving Trust, Gibraltar's clearance agent, against payment of $2,888,333.34. Gibraltar instructed Irving Trust "to receive" them from Chemical against payment, and to deliver them against *128 payment to C. F. Childs Co., which had sold them. Irving charged Gibraltar's account $2,888,333.34, and credited the account $2,885,520.84, leaving a balance on the books owing by Gibraltar to Irving of $2,812.50. 4. On March 11, 1953, Gibraltar opened an account on its books in the name of Melcher, a "Secured Account", in which an entry was made that $3,000,000 Federal Land Bank bonds due 10/1/57 had been "Bought or Received" for the account, and were held "Long"; also Melcher's account was charged $3,156,000, which represented the face amount of a promissory note of Melcher payable to Gibraltar. This entry reflected the execution of the note. 5. The face amount of the note represented the total of $2,888,333.34 the cost of the bonds, and $267,666.66 a "reserve" fund. The $2,888,333.34 was never paid to or loaned to Melcher; Gibraltar did not have that sum to loan to Melcher. Gibraltar paid Melcher, by checks, between March 11, 1953, and October 1, 1955, $267,666.66 in installments on about the same dates as Melcher made payments, by checks, of installments of purported "interest" on his note. The facts about both installment payments are set forth later. 6. Melcher executed a printed *129 note of Gibraltar dated March 11, 1953, 2n the amount of $3,156,000, payable to Gibraltar on October 1, 1955, bearing 4 1/4 percent interest, payable in monthly installments on the dates and in the amounts typed on the note. This note was security for the purported loan by Gibraltar to Melcher of the above amount, and it was stated on the note that it was secured by the pledge to Gibraltar of the $3,000,000 Land Bank bonds, as described hereinbefore. The provisions of the note included the following: That Gibraltar had the right to borrow, re-hypothecate, use, or transfer the pledged bonds for any purpose whatsoever, and at its option to use the pledged bonds "to cover delivery of any securities of similar kind which may have been sold to others by The Gibraltar Financial Corporation, as principal and for its own account." 1013 The note provided further that the signer of the note, Melcher, could obtain the return of the pledged bonds, or "collateral of like kind" upon the full payment of the principal of the note, together with interest due, on the due date, October 1, 1955, or upon payment of the indebtedness, with interest, prior to September 1, 1955, (which would be a prepayment *130 of the note before its due date). However, there was a charge for the exercise of the right to make prepayment of the note before its due date of 1 1/2 percent per year of the principal amount from the date of prepayment to October 1, 1955. The prepayment privilege ended on September 1, 1955. The right to make prepayment of the principal amount of the note required the giving of 10 days' notice to Gibraltar. As is stated hereinafter, the renewal note did not contain the right to make prepayment of principal at any time at the option of Melcher. The note provided that the interest on the pledged bonds would be applied to the principal amount of the note, and that the signer of the note would not be entitled to a refund of any interest paid on the note as a result of such reduction in the principal amount of the note. The note was renewable for the unpaid balance of principal on October 1, 1955, and could be extended to October 1, 1957. The renewal note was to bear interest for the additional period of time of 2 1/4 percent, payable on the first day of April and October. It was stated on the original note of March 11, 1953, that the 4 1/4 percent interest was to be paid in installments *131 of specified amounts on the dates and in the amounts typed on the note, namely, $17,399.65 on March 11, June 15, September 15, and December 15, 1953, a total sum of $69,598.60 in 1953; $17,399.65 on January 15, 1954, and $13,049.74 per month beginning on February 15, 1954, through December 15, 1954, a total of $160,946.79 for 1954; and $13,049.74, monthly, on January 15, 1955, through August 15, 1955, and on September 15, 1955, $13,049.64, or a total of $117,447.66 for 1955. The sum of all of the periodic payments of "interest" on the original note, as typed on the note, was $347,993.05. However, the note also provided that Gibraltar would pay Melcher $267,666.66, to be paid in equal installments on the dates when Melcher was to pay "interest" to Gibraltar, upon the condition that the interest payments were made by Melcher. The way in which this provision of the note was carried out is set forth hereinafter. The total charge by C-F for the bonds was $2,888,333.34, but the note of Melcher to Gibraltar was for $3,156,000, which was $267,666.66 more than the charge for the bonds. The printed note executed by Melcher states that as "security" for the payment of interest on the note, Gibraltar *132 had withheld $267,666.66 of the principal amount of the note as a "reserve," and that Gibraltar would release and pay to Melcher the "reserve" in equal installments on the interest due dates set forth in the note upon the condition that the interest payments would be made. The terms of Melcher's note to Gibraltar specifying Melcher's periodic payments of interest on the note, and those relating to Gibraltar's periodic payments to Melcher out of the so-called "reserve" of the principal amount of the note, were carried out by Melcher and Gibraltar, respectively. Gibraltar mailed notices to Melcher stating that a payment of an installment of interest would be due, as provided in the note. Melcher wrote checks payable to Gibraltar for each installment of interest. Gibraltar, in turn, mailed its checks to Melcher in amounts representing Gibraltar's "release" to him of parts of the so-called reserve of $267,666.66. During the period March 9, 1953, to September 19, 1955, Melcher's checks to C-F or to Gibraltar, for note interest, totaled $347,993.05, as prescribed, and Gibraltar's checks to Melcher totaled the amount of the so-called reserve of the principal amount of the note, $267,666.66. *133 In effect, Gibraltar repaid to Melcher the above sum, and Melcher paid to C-F or Gibraltar from his own funds the net sum of $80,326.39, being the difference. The following schedules set forth for 1953-1955, the respective amounts of Melcher's payments to C-F or Gibraltar, and Gibraltar's payments to Melcher: Payments ofMelcher (M) toC-F & Gibraltar(G); Paymentsof Gibraltarto Melcher;and Net Sum Paidby Melcher *10 1953
Check Dates
Net Paid by Melcher
3/ 9/53
M to C-F
$17,399.65
3/11/53
G to M 13,383.33
Net paid by M
$ 4,016.32
6/ 3/53
M to C-F
17,399.65
6/ 5/53
G to M 13,383.33
Net paid by M
4,016.32
9/14/53
M to C-F
$17,399.65
9/15/53
G to M 13,383.33
Net paid by M
$4,016.32
12/ 2/53
M to C-F
17,399.65
12/ 7/53
G to M 13,383.33
Net paid by M
4,016.32
12/29/53
M to C-F
17,399.65
12/29/53
G to M 13,383.33
Net paid by M
4,016.32
Summary - 1953
Total paid Melcher to C-F
$ 86,998.25
Total paid Gibraltar to Melcher 66,916.65
Net paid by Melcher to C-F
$ 20,081.60
1954
2/ 9/54
M to G
$13,049.74
2/12/54
G to M 10,037.50
Net paid by M
$ 3,012.24
3/10/54
M to G
13,049.74
3/18/54
G to M 10,037.50
Net paid by M
3,012.24
4/ 7/54
M to G
13,049.74
4/14/54
G to M 10,037.50
Net paid by M
3,012.24
5/12/54
M to G
13,049.74
5/17/54
G to M 10,037.50
Net paid by M
3,012.24
6/ 9/54
M to G
13,049.74
6/15/54
G to M 10,037.50
Net paid by M
3,012.24
7/ 7/54
M to G
13,049.74
7/14/54
G to M 10,037.50
Net paid by M
3,012.24
8/11/54
M to G
13,049.74
8/16/54
G to M 10,037.50
Net paid by M
3,012.24
9/ 8/54
M to G
13,049.74
9/14/54
G to M 10,037.50
Net paid by M
3,012.24
10/ 6/54
M to G
13,049.74
10/ 8/54
G to M 10,037.50
Net paid by M
3,012.24
11/10/54
M to G
13,049.74
11/15/54
G to M 10,037.50
Net paid by M
3,012.24
12/ 8/54
M to G
13,049.74
12/15/54
G to M 10,037.50
Net paid by M
3,012.24
Summary - 1954
Total paid Melcher to G
$143,547.14
Total paid Gibraltar to Melcher 110,412.50
Net paid by Melcher to G
$ 33,134.64
1955
1/ 2/55
M to G
$13,049.74
1/17/55
G to M 10,037.50
Net paid by M
$ 3,012.24
2/ 9/55
M to G
13,049.74
2/16/55
G to M 10,037.50
Net paid by M
3,012.24
3/ 9/55
M to G
13,049.74
3/16/55
G to M 10,037.50
Net paid by M
3,012.24
4/ 6/55
M to G
13,049.74
4/14/55
G to M 10,037.50
Net paid by M
3,012.24
5/11/55
M to G
13,049.74
5/16/55
G to M 10,037.50
Net paid by M
3,012.24
6/16/55
M to G
13,049.74
6/17/55
G to M 10,037.50
Net paid by M
3,012.24
7/13/55
M to G
13,049.74
7/15/55
G to M 10,037.50
Net paid by M
3,012.24
8/24/55
M to G
13,049.74
8/29/55
G to M 10,037.50
Net paid by M
3,012.23
9/14/55
M to G
13,049.74
9/19/55
G to M 10,037.51
Net paid by M
3,012.23
Summary - 1955
Total paid Melcher to G
$117,447.66
Total paid Gibraltar to Melcher 90,337.51
Net paid by Melcher to G
$ 27,110.15
Summary of "Interest" Payments
1953-1955
Total "interest" payments by Mel- cher per note
$347,993.05
Total payments by Gibraltar to Mel- cher 267,666.66
Net payments by Melcher from own funds
$ 80,326.39
*134 1014 7. Melcher took deductions for "interest" on his income tax returns for the years 1953-1955 in the sum of his payments to Gibraltar, as set forth above, namely: 1953, $86,998.25; 1954, $143,547.14; 1955, $117,447.66; total deductions $347,993.05. 8. Since the Land Bank bonds had been sold by Gibraltar on March 11, 1953, 1015 Gibraltar did not receive any coupon interest on the bonds for Melcher. Nevertheless Gibraltar made credits in Melcher's account in the amount of the semi-annual, or annual, coupon interest on the bonds during the period March 11, 1953, to September 6, 1957. During 1956 and 1957, Gibraltar sent its checks to Melcher in the same amounts as the semi-annual bond interest at the same time as Melcher sent his checks to Gibraltar for "interest" on his note to Gibraltar (the second note), as is set forth later. Melcher and Gibraltar exchanged checks. Melcher reported as "income", on his tax returns for 1953-1957, the amounts of Gibraltar's checks and credits to him for the purported "interest" on the bonds. As of March 11, 1953, when there was a purchase of the bonds, the accrued interest on the bonds was $23,333.34. Since that amount was part of the total charge *135 for the bonds, Melcher did not report it as "bond interest" in his 1953 income. The interest on the bonds was $52,500 per year. That amount, less $23,333.34, would be $29,166.66. Gibraltar credited the principal amount of Melcher's note with $52,500 for 1953, even though it did not actually receive that amount. Melcher reported $29,166.66 as "bond interest" on his 1953 return. 9. Gibraltar credited the principal amount of Melcher's note with $52,500 for each year 1953, 1954, and 1955, or $157,500, even though Gibraltar did not receive such "bond interest". Those credits reduced the principal of the note from $3,156,000 to $2,998,500, as of October 1, 1955, when the note became due. 10. Melcher executed a second renewal note dated October 1, 1955, in the principal amount of $2,998,500, payable to Gibraltar on October 1, 1957, bearing 2 1/4 percent interest. The note stated that it was secured by the pledge of $3,000,000 Land Bank bonds bearing 1 3/4 percent interest, due October 1, 1957. Some of the provisions of the second note were the same as in the first note, but there was no provision that part of the principal amount was retained by Gibraltar as a "reserve" for interest, and *136 there was no provision for applying any bond interest to reduce the principal amount. As before, Gibraltar could borrow and use the pledged bonds. The second note differed from the first note in several respects. Upon written notice to Gibraltar, Melcher could apply the market value of the "pledged bonds" to payment of the note but such election could be exercised no more than 30 days and no less than 10 days before October 1, 1957, the due date of the note. On Gibraltar's books the amount of the purported loan of $3,156,000 was reduced by the credits for the purportedly accrued "bond interest", so that as of October 1, 1955, the purported loan had been reduced to $2,998,500, the amount of the second note. The amounts and due dates of interest on the second note were stated as follows: April 1 and October 1, 1956, $34,295.34 on each date; April 1, 1957, $34,107.94; and October 1, 1957, $34,295.34; total, $136,993.96. The last installment of interest was reduced by $5,247.37, as of September 6, 1957, to $29,047.97, which reduced the total "interest" to $131,746.59. 11. Melcher made payments by check to Gibraltar for the interest on the second note for 1956 and for April 1, 1957. He *137 made a cash payment for note interest accrued to September 6, 1957, of $6,443.80 after a credit of $22,604.17 for bond "interest". He took deductions for "interest" on the second note of $68,590.68 for 1956, and $63,155.91 for 1957. The total deduction for the "interest" charged on the second note was $131,746.59. Gibraltar paid the purportedly accrued bond "interest" to Melcher, $52,500 for 1956, and $26,250 due on April 1, 1957; total $78,750, which Melcher reported as income in his returns for 1956 and 1957. For 1956 and April 1, 1957, Melcher paid Gibraltar as note "interest" $102,698.62, and Gibraltar paid Melcher $78,750 as "bond interest", so that the net amount paid by Melcher was $23,948.62. 12. As of September 6, 1957, Gibraltar purportedly "sold" $3,000,000 Land Bank bonds for Melcher's account, according to a broker's slip, but the evidence does not disclose the mechanics. The amount of the accrued, purported bond "interest" to September 6 was $22,604.17. The amount of the note "interest" to September 6 was $29,047.97, which was charged to Melcher's account. The credit to Melcher's account as of September 6 of the proceeds of the "sale" of bonds provided a credit of the *138 "accrued bond interest," $22,604.17, to the charge for accrued note "interest", $29,047.97, leaving a balance due for accrued note "interest" of $6,443.80, which Melcher paid to Gibraltar on December 4, 1957, part of Melcher's total payment of $11,131.20, the balance owing to Gibraltar after bonds were sold on September 6. Melcher's payment of $6,443.80 as note interest increased the net amount of his payments of "interest" on the second note, from his own funds, from $23,948.62 to $30,392.42: 1016 *10 Summary of Net Cash "Interest" Payments on Second Note, 1956-1957
Total "interest" payments by Mel- cher & credit
$109,142.42
Total bond interest paid by Gibral- tar 78,750.00
Net payments by Melcher from own funds
$ 30,392.42
13. The following schedule shows Melcher's cash payments of "interest" on the second note; Gibraltar's payments to him of "accrued bond interest"; the net expense to Melcher (from his own funds) of note "interest"; and the credit to Melcher's account for "accrued bond interest" on September 6, 1957, which credit on the books was a part of the credit for the proceeds from the sale of bonds. *10 Melcher's Second Note, and Gibraltar's
Payments to Melcher *10 Cash for Note "Interest"; Cash for Bond
"Interest"; Credit Cash Accounting
Dates
Paid by Melcheras Note"Interest"
Paid byGibraltar asBond "Interest"
Net Expenseof Melcher
4/18/56
$ 34,295.34
$26,250.00
$ 8,045.34
10/ 1/56
34,295.34
26,250.00
8,045.34
5/10/57
34,107.94
26,250.00
7,857.94
12/ 4/57 6,443.80
0
6,443.80
$109,142.42
$78,750.00
$30,392.42
9/ 6/57 22,604.17 Credit of BondInterst toMelcher
$131,746.59
Total "Interest" on Sec- ond Noteof Melcher
*139 The net expense to Melcher, in cash, with respect to "interest" on his two notes was $110,718.81, after receiving cash payments from Gibraltar: Note 1 Net cash expense
$ 80,326.39
Note 2 Net cash expense 30,392.42
Total net cash expense
$110,718.81
Melcher's deductions on his income tax returns, for the years 1953-1957, totaled $479,739.64, which represented his cash payments to Gibraltar of purported interest on his two notes, $457,135.47, and Gibraltar's credit on its books to Melcher's account of $22,604.17, the purported, accrued interest on the bonds which were sold on September 6, 1957. 14. As of September 6, 1957, the transaction was concluded by a purported sale of $3,000,000 of Land Bank bonds. The evidence does not disclose the mechanics followed by C-F and Gibraltar. The evidence does not show that Gibraltar had reacquired any bonds for Melcher's account. C-F issued a broker's slip addressed to Melcher as of September 6, 1957, showing a sale of $3,000,000 Land Bank bonds due October 1, 1957, at 99-27/32, $2,995,312.50, less C-F's commission of $1,500, or $2,993,812.50; and also showing accrued "bond interest" of $22,604.17. The total "sale proceeds" was $3,016,416.67: Selling price, 99-27/32
$2,995,312.50
Less C-F commission 1,500.00
$2,993,812.50
Accrued bond interest 22,604.17
Total proceeds
$3,016,416.67
15. *140 In Melcher's account, an adjustment of 10 cents was made to reduce the principal amount of his second note from $2,998,500 to $2,998,499.90. As of September 6, a charge was made for accrued note interest of $29,047.97, so that there was purportedly owing to Gibraltar $3,027,547.87. His account was credited with the above $3,016,416.67 "sale proceeds", which left a balance due Gibraltar of $11,131.20. Gibraltar sent Melcher a letter stating the balance due, which Melcher paid by check on December 4, 1957, which closed the account in Melcher's name on Gibraltar's books. As stated above, there was due as the balance of note "interest" accrued to September 6, 1957, after a credit of part of the proceeds of selling bonds, $6,443.80. That amount was part of the balance owing to Gibraltar, $11,131.20. The difference, $4,687.40, represented the balance which purportedly was owing and due on Melcher's second note after the credit to Melcher's account of the proceeds from the sale of bonds of $3,016,416.67. Accordingly, Melcher's closing payment of $11,131.20 represented the following: Balance due on second note
$ 4,687.40
Balance due on note "interest" 6,443.80
$11,131.20
16. On his 1957 tax return, *141 Melcher reported a long-term capital gain from the sale of Federal Land Bank bonds of $128,812.50, of which 50 percent was taken into account in reporting income from capital gains: 9/ 6/57
Proceeds from sale
$2,993,812.50
3/11/53
Cost 2,865,000.00
Capital gain
$ 128,812.50
17. In fact, the arrangements and the transaction for Melcher by C-F and Gibraltar did not yield a real and true gain of 1017 $128,812.50. Rather, the whole transaction, apart from the anticipated tax benefits, resulted in a deficit in the account on Gibraltar's books of $4,687.40. The deficit resulted from the fact that the purported "loan" of Gibraltar to Melcher included a purported "loan" of $267,666.66, to cover part of the note interest, so that the total purported "loan" of $3,156,000, plus all of the charges for note interest, less all of the credits to principal and note interest, for bond interest, was not fully satisfied by the sale of bonds in 1957, and the account showed an amount still "owing" by Melcher of $4,687.40 on the principal amount of the "loan". 18. The schedule set forth later is a summary of the account on Gibraltar's books in the name of Melcher which was the bookkeeping record of the purported *142 loan in 1953 of $3,156,000. This schedule reflects Gibraltar's charges on its books, in the total amounts, respectively, for interest on each one of the two notes, and the total sum of the credits to the account for bond interest, and note interest. As of September 6, 1957, the debits exceeded the credits by $4,687.40, so that the entire transaction, after the sale on that date, of $3,000,000 Land Bank bonds (to close the transaction) showed a loss instead of a gain to Melcher of $4,687.40, apart from anticipated tax benefits, which was the balance due to Gibraltar, which was paid by Melcher. In his 1957 income tax return, Melcher reported a capital gain of $128,812.50 from the sale of bonds. However, the initial note to Gibraltar was for $3,156,000, and that figure incorporated the "reserve" for note interest of $267,666.66, and bond interest accrued to March 11, 1953, $23,333.34, or $291,000. Thus, the initial debit to Melcher's account included $291,000 more than the "cost" of the bonds in 1953 ($2,865,000) used in computing "gain" upon the sale of a like amount of bonds in 1957. The credits, direct or part of some larger credit figure, in the account which offset the debits of *143 $291,000 were credits to capital (rather than to the charges for interest). They totaled $286,312.60, which was $4,687.40 less than the above-described debits. Those credits were an unexplained ten cents ($0.10) adjustment in reduction of the principal amount of the second note; the credit to the principal of the first note of $157,500 for accrued bond interest for three years, 1953-1955, inclusive; and the "capital gain" of $128,812.50. Melcher did not in reality and in fact realize any "capital gain" when the bonds purportedly were "sold" on September 6, 1957, because his note to Gibraltar at that time had an adjusted balance of $2,998,499.90, which was a debit in his account on Gibraltar's books, the principal amount charged to him. That charge exceeded the "credit" to his account for the purported "sale" of the bonds, $2,993,812.50, by $4,687.49. Melcher paid Gibraltar the balance on the principal amount of his note to Gibraltar after the "sale" of the bonds, namely, $4,687.40. The purported capital gain on the transaction in 1957 ($128,812.50) was unreal, it lacked substance, and it was a component part of the sham transaction. The transaction was one from which a real and actual *144 gain from the purported purchase and the purported sale of the bonds could not reasonably be expected or realized, apart from tax benefits, because the total "charge" for principal to Melcher on March 11, 1953, included $267,666.66, in addition to the "charge" for the bonds, $2,888,333.34, and the total charge for "interest" on the note was, at first, $347,993.05. Thus, the principal amount charged to Melcher, which was the principal amount of his original note to Gibraltar, was $3,156,000.00, and after credits to that amount for purported bond interest $157,500 and 10 cents leaving a balance of $2,998,499.90. it would have been necessary to "sell" the bonds for $2,998,499.90, rather than $2,993,812.50, in order for the proceeds from the "sale" of the bonds to have equalled the balance due on Melcher's note to Gibraltar. If the Land Bank bonds had been sold at par, $3,000,000, and C-F's commission had been $1,500 (the same as C-F charged) the net "sale proceeds" would have been $2,998,500, which would have been equal to the principal amount of Melcher's renewal note to Gibraltar before the adjustment of 10 cents reducing it to $2,998,499.50. The "reserve" of $267,666.66, which was *145 included in the amount of Melcher's note to Gibraltar, was off-set by the credits during 1953-1955 to principal for the purported interest on the bonds of $157,500, but there remained $110,166.66 as a charge to Melcher, which was part of $2,998,500, the principal amount of the renewal note on October 1, 1955 ($2,888,333.34, charge for bonds, plus $110,166.66 equals $2,998,500.00). When on September 6, 1957, the bonds purportedly were sold for the net amount of $2,993,812.50, that amount exceeded the total charge for the bonds, reduced by 10 cents, on March 11, 1953, of $2,888,333.24, by $105,479.26. However, that "credit" in 1018 effect, to Melcher's account on September 6, 1957, was $4,687.50 less than the balance of the "reserve", $110,166.66, which was part of the debit to the account for the renewal note of $2,998,499.90: Debit for bal. of "reserve" in note
$110,166.66
Credit excess of "sale proceeds" 105,479.26
Balance owed by Melcher
$ 4,687.40 The inclusion of the so-called "reserve" for note "interest" of $267,666.66, in the principal amount of Melcher's note to Gibraltar, $3,156,000, plus the charges for "interest" on the note of $479,739.64, served to make the transaction one *146 from which Melcher could not have reasonably expected to realize any gain, since the bond "interest" was only 1 3/4 percent and the market prices of the bonds, due October 1, 1957, at par, could not have been expected to exceed 100 by any significant amount. In fact, during the period February 2, 1953, to September 3, 1957, the bid market prices of the bonds did not exceed 99-26/32, which was the highest bid price, as the schedule set forth hereinafter shows. The transaction was not entered into for profit apart from anticipated tax benefits and deductions. The following schedule shows and explains the entire transaction, the charges and the credits to Melcher's account on Gibraltar's books. The net result of the entire transaction was that Melcher in the end owed Gibraltar $4,687.40, which in substance was an expense or a loss to him. He did not realize a monetary profit or gain when the bonds were "sold". *10 Debits to Melcher's Account
3/11/53
Charge $3for,000,000 bonds
$2,865,000.00
3/11/53
Charge for accrued bond interest 23,333.34
2,888,333.34
3/11/53
Gibraltar's charge for "re- serve" 267,666.66
3/11/53
Amount of Melcher's note
$3,156,000.00
"Interest" charged on note of 3/11/53
347,993.05
"Interest" charged on re- newal note $ 131,746.59
Total charges to account
$3,635,739.64
Credits to Melcher's Account
1953-1955
Bond "Interest" credit to principal
$ 157,500.00
1953-1955
Paid by Gibraltar to Melcher
267,666.66
1953-1955
Net "interest" pd. by Melcher
80,326.39
1955-1957
Bond "interest" pd. by Gibraltar to Melcher
78,750.00
1955-1957
Net "interest" pd. by Melcher
30,392.42
9/6/57
Bond "interest" cred- ited by Gibraltar 22,604.17
1955-1957
Cash pd. and credits
637,239.64
9/6/57
Credit for "sale" of bonds
2,993,812.50
Credit to principal of note .10
Total credits to account
$3,631,052.24
BALANCE OWING BY MELCHER, PD. 4,687.40
Total credits to account
$3,635,739.64
*147 19. Melcher reported as income in his returns for the years 1953-1957, interest received on Federal Land Bank bonds in the total amount of $235,520.83. The following shows the amount of bond interest reported for each year: *10 Bond Interest Reported as Income
1953 Credited by G to note
$29,166.66
1954 Credited by G to note
52,500.00
1955 Credited by G to note
52,500.00
1956 Paid by G to Melcher
52,500.00
1957 Paid by G to Melcher
$26,250.00
Sale proceeds credit 22,604.17
48,854.17
$235,520.83
As stated above, Melcher reported in his 1957 return capital gain of $128,812.50, of which one-half $64,406.25 was included in income (adjusted for an item of capital loss). The following schedule and schedule footnotes [3] summarize the results of the procedures followed with respect to petitioners' income tax returns when the deductions for "interest" on his notes to Gibraltar are offset by "income" reported for bond 1019 "interest." The "income" items served to neutralize part of the deductions taken for "interest" on the notes to Gibraltar. Even so, the net result provided petitioners with deductions of substantial amounts, especially for 1953, 1954, and 1955. For 1957, the transaction did not yield a tax *148 benefit at all as the total of the "income" items reported for bond "interest" and for the taxable one-half of the purported "capital gain" from the "sale" of the Land Bank bonds, $113,260.42, exceeded the deduction for note "interest" of $63,155.91 by $50,104.51: Year
Bond "Inter- est"Reported as Income
Note "Inter- est"to G Deducted
Net Deduction
1953
[1] $ 29,166.66
$ 86,998.25
$ 57,831.59
1954
[2] 52,500.00
143,547.14
91,047.14
1955
[2] 52,500.00
117,447.66
64,947.66
1956
[3] *149 52,500.00
68,590.68
16,090.68
1957
[3] 48,854.17
63,155.91
14,301.74
$235,520.83
$479,739.64
$244,218.81
1957 Capi- tal Gain
[4] 64,406.25
$299,927.08 In their joint income tax returns for the taxable years 1953-1957, the petitioners reported adjusted gross income, total deductions, and taxable income after exemptions as follows: Year
Adjusted Gross Income
Total Deductions
Taxable Income
1953
$149,957.70
$ 97,914.82
$50,242.88
1954
261,463.47
199,253.44
60,410.03
1955
209,582.98
129,537.41
78,245.57
1956
261,836.80
165,998.85
94,037.95
1957
141,273.79
85,916.72
53,557.07
The respondent conceded at the trial of these cases that if his determinations are sustained by this Court, disallowing the deductions taken as "interest" on the purported "loan" of Gibraltar to Melcher, then there shall be excluded from Melcher's income for each of the taxable years the amount included in income as bond interest, for each year, and the capital gain reported for 1957 as gain from the sale of Land Bank bonds. 20. The amounts *150 deducted for each year as "interest" on the purported loan of Gibraltar totaled $479,739.64, as shown below: *10 Deductions for Purported "Interest" on Notes to Gibraltar
Year
Method of Payment
Amount
1953
Cash
$ 86,998.25
1954
Cash
143,547.14
1955
Cash
117,447.66
1956
Cash
68,590.68
1957
Cash
$34,107.94
Cash
6,443.80
Credit, sale of bonds $22,604.17
$63,155.91
Total deductions $479,739.64
Total cash payments $457,135.47 21. Melcher's total cash payments to Gibraltar for the "interest" charged by Gibraltar on the purported loan of $3,156,000, $457,135.47 plus the cash paid as the balance owing at September 6, 1957, on the purported loan, $4,687.40, brought the total sum of his cash payments to Gibraltar to $461,822.87, before taking into account Gibraltar's payments to Melcher of $267,666.66, and as accrued interest on the bonds; and without taking into account the credit for accrued bond interest of $22,604.17 as part of the proceeds from the sale of bonds in 1957. After taking into account all of Gibraltar's payments to Melcher, and the credit of $22,604.17 as of September 6, 1957, Melcher's net payments in cash to Gibraltar amounted to $115,406.21, the total of the net amount of cash paid as alleged "interest," *151 $110,718.81, plus the balance due on the purported loan, $4,687.40. The amount of $115,406.21 represented Melcher's expense of the whole transaction, or his so-called out-of-pocket expense. 22. The following schedule summarizes and accounts for the purported "interest" charges of Gibraltar on the purported "loan" to Melcher; the payments and credits of Gibraltar on account of its charges for "interest"; and Melcher's net cash payments from his own funds: *10 Charges and Credits, "Interest" Account
Debit
Credit
"Interest" on Note 1
$347,993.05
"Interest" on Note 2
131,746.59
Cash paid by Gibraltar, Note 1
$267,666.66
Cash paid by Gibraltar, bond interest
78,750.00
Credit from sale of bonds
22,604.17
Total cash & credit from Gibraltar
$369,020.83
Net cash paid by Melcher
110,718.81
$479,739.64
$479,739.64
23. The schedule set forth below shows that apart from expected tax benefits, the transaction arranged by C-F and Gibraltar resulted in an economic loss to Melcher of $115,406.31. This amount is by coincidence, except for a difference of ten cents, the same as Melcher's net out-of-pocket expense of $115,406.21, as follows: 1020 Net cash paid as Note 1 "interest"
$ 80,326.39
Net cash paid as Note 2 "interest"
23,948.62
Cash paid Note 2 "interest" as of 9/6/57 6,443.80
Net cash "interest" paid
$110,718.81
Cash paid as bal. due on Note 2, 9/6/57 4,687.40
Total out-of-pocket expense
$115,406.21
The *152 following computation of Melcher's "net loss" reflects a net loss according to the entire transaction according to the account on Gibraltar's books, and according to the form of the transaction, and it includes the purported "interest" on the bonds, and the purported "capital gain" from the purported "sale" of bonds on September 6, 1957, reported in the 1957 return. It appears to be a coincidence in arithmetic that Melcher's net out-of-pocket expense of $115,406.21, the cost of the transaction to him, was the same as the (except for 10 cents difference) "economic net loss" which takes into account the purported "capital gain," and reflects the transaction as it was carried out: Net Economic Loss
(a) "Interest" charged on notes
$479,739.64
(b) Capital gain
$128,812.50
(c) Bond interest reported in income 235,520.83
364,333.33
(d) Net economic loss
($115,406.31)
24. The following sets forth the range of the high and low bid prices (at which a purchaser will buy) for the Land Bank bonds involved in the transaction in issue during the years 1953-1957: Year
High Bid
Low Bid
1953
96-28/32
94-16/32
1954
99-26/32
97- 4/32
1955
99
97-10/32
1956
98-14/32
97-16/32
1957
99-26/32
98-10/32
The following is a list of the bid *153 prices on the market, for the Land Bank bonds due October 1, 1957, during the period February 2, 1953, to September 3, 1957. In the list, prices are stated with fractions having a denominator of "32," but the denominator is omitted, and a fraction of 12, for example, means 12/32. Since the bonds were due on October 1, 1957, and were redeemable at par, the bid prices tended to approach 100 as the time before the due date became shorter: *10 Federal Land Bank Bonds, 10/1/57, Bid Prices
Date 1953
Bid Price
Date 1954
Bid Price
Date 1956
Bid Price
Feb. 2
95-12
Oct. 11
99-24
Apr. 2
97-21
Mar. 2
95-12
Oct. 16
99-16
Apr. 17
97-16
Apr. 30
95-8
Nov. 1
99-16
May 1
97-18
May 29
94-26
Nov. 15
99-12
May 18
97-20
June 8
94-16
Dec. 1
99-14
June 1
97-24
July 1
94-26
Dec. 29
99-0
June 28
98-8
July 29
95-0
1955
July 17
98-13
Aug. 11
95-6
Jan. 3
99-0
July 27
98-10
Aug. 28
94-30
Jan. 18
98-18
Aug. 5
98-6
Sept. 9
94-26
Feb. 1
98-20
Aug. 28
98-1
Sept. 29
95-10
Feb. 25
98-8
Sept. 6
97-30
Oct. 1
95-18
Mar. 1
98-4
Sept. 25
98-2
Oct. 29
96-4
Mar. 23
98-10
Oct. 1
98-4
Nov. 2
96-8
Apr. 1
98-8
Oct. 18
98-8
Nov. 25
96-6
Apr. 28
98-0
Nov. 8
98-14
Dec. 1
96-8
May 2
98-0
Nov. 29
98-10
Dec. 30
96-28
May 18
98-6
Dec. 6
98-8
1954
June 10
98-5
Dec. 17
98-8
Jan. 4
97-4
June 27
98-2
1957
Jan. 27
98-14
July 1
98-0
Jan. 2
98-10
Feb. 1
98-26
July 29
97-28
Jan. 31
98-22
Feb. 24
99-4
Aug. 1
97-26
Feb. 1
98-23
Mar. 1
99-6
Sept. 6
97-10
Feb. 27
98-28
Mar. 25
99-14
Sept. 27
97-16
Mar. 1
99-0
Apr. 1
99-12
Oct. 4
97-16
Mar. 22
99-0
Apr. 27
99-16
Oct. 25
97-24
Apr. 1
99-1
May 3
99-16
Nov. 1
97-28
Apr. 27
99-7
May 27
99-4
Nov. 30
97-20
May 1
99-6
June 1
99-4
Dec. 23
97-16
May 9
99-9
June 23
99-16
1956
June 3
99-10
July 1
99-16
Jan. 3
97-16
June 5
99-8
July 15
99-24
Jan. 19
98-6
July 1
99-14
Aug. 4
99-26
Feb. 1
98-7
July 18
99-20
Sept. 1
99-26
Mar. 1
98-2
Aug. 1
99-21
Sept. 24
99-20
Mar. 29
97-20
Sept. 3
99-26
*154 1021 Issue 2: Purchase of Residence, 1956; Alleged Indebtedness of $80,000; Alleged Interest $76,000; Claimed Interest Deduction The residential property owned by Mr. and Mrs. Alfred Wallenstein, located at 713 North Crescent Drive, Beverly Hills, was available for sale in August 1956. On October 11, 1956, Martin and Doris Day Melcher received the deed and title to this property. The deed was recorded on October 11, 1956. The Melchers moved to this property; it became their resident. Samuel Norton, an attorney and business adviser to the Melchers, negotiated the purchase of the property. His offer, to the real estate agents representing the Wallensteins was accepted. The Wallensteins received $85,000. The commissions of their two agents, $4,250, was paid by the purchaser. Questions under this issue are: "In the first instance, were the Melchers the actual purchasers of the Wallenstein property? What recognition, if any, can be given to the alleged purchase of the property by a corporation named Connoring, later called 250 Building Corporation, and to the alleged "resale", immediately, by the corporation to the Melchers? Douglas Adamson, real estate salesman, showed Doris Day Melcher *155 the Wallenstein property in August 1956, one week before August 13, 1956. She regarded the property favorably because she believed it provided facilities which she needed in her business as an actress. A few days after Mrs. Melcher had looked at the property, Melcher and his lawyer, Samuel Norton, inspected the property. Adamson said that the property was being offered for sale at about $92,500 or $95,000. On August 11, 1956, a special meeting was held of the directors of Connoring Corporation, later known as the 250 Building Corporation. The corporation was organized on April 23, 1956. Fifty percent of its stock was owned by: Samuel P. Norton, 20 percent; Jerome B. Rosenthal, 20 percent; and the Melchers, 10 percent. The office of the corporation (at all times material) was at the same address as the law firm of Rosenthal and Norton, 242 North Canon Drive, Beverly Hills. Rosenthal, Norton, and Melcher were members of the board of directors, of which there were four, and they attended the directors' meeting on the above date. The minutes of this meeting reflect that Norton explained that a piece of residential realty located at 713 North Crescent Drive was for sale. He stated that *156 he believed the property could be purchased at a price which would be likely to make its purchase, and its resale to a customer, profitable to the corporation. Resolutions were adopted at the meeting authorizing the corporation to purchase the property located at 713 North Crescent Drive, Beverly Hills, and to sell the same property on such terms as would be agreed upon by the officers of the corporation and the purchasers. On August 13, 1956, Adamson met with Melcher, Norton, and Trynes, a real estate broker, at Norton's law office. At this meeting, an offer was made in the name of the Connoring Corporation to purchase the home owned by Mr. and Mrs. Wallenstein. That was the first time anyone mentioned the Connoring Corporation to Adamson. Norton told Adamson the home was being purchased through the Connoring Corporation for the petitioners. On August 13 a purchase agreement was executed whereby the Wallensteins agreed to accept $85,000 for the property. It was also agreed that the purchaser would pay their real estate agents' commissions of $4,250. This transaction was an arm's length purchase and sale which established that the fair market value of the property was $85,000, and *157 that the cost to the buyers, including the commissions, was $89,250. On August 13, 1956, a deposit of $5,000 was paid, under the purchase agreement, to the real estate agent's firm, Adamson & Hupp, by a check of Connoring Corporation. On August 14, an escrow account was opened at the Beverly Hills branch of the California Bank in the name of Connoring Co., No. 156-13560-H, for the purpose of handling the purchase of the property from the Wallensteins. At about the same time, or soon after, a second escrow account, No. 156-13690-H, was opened at the same branch of the bank in the names of the Melchers. Both escrow accounts were opened to handle the closing of the purchase of the Wallenstein property. Both accounts were to be closed, and were closed, on the same day, October 11, 1956. The Wallensteins executed a deed to the property, on August 14, to Connoring Co., which was deposited in its escrow account, 13560-H. Connoring Co. obtained a loan of $30,000 from Home Savings and Loan, on September 14, secured by a first mortgage on the property purchased from the Wallensteins, 1022 and deposited that amount in its escrow account, 13560-H. On September 27, 1956, Doris Day Melcher gave *158 her check for $50,000, dated September 25, to the California Bank for deposit in the Melcher's escrow account, 156-13690-H, with instructions to transfer the $50,000 to Connoring's account, 156-13560-H. In her written escrow instructions, she stated that the $50,000 was not to be applied to the "purchase price of the property" as it was being acquired from Connoring Co. On October 4, 1956, the Melchers executed a deed of trust (second mortgage) on the Wallenstein property, dated September 25, 1956, naming California Bank the trustee, and 250 Building Co. (Connoring) the beneficiary. The Melchers also executed a purported promissory note for $80,000 payable to 250 Building Co. dated September 25, 1956, due in 15 years. The deed of trust was executed to secure the note. On October 4 the 250 Building Co. executed a deed of the Wallenstein property to the Melchers which was deposited in the escrow account in the names of the Melchers. The escrow account of Connoring, 156-13560-H, for clearance of the sale by the Wallensteins to Connoring, shows total cash receipts of $91,193.50, that $90,592.05 was paid out on October 11, 1956, at the closing, that $588.25 was transferred to the other *159 escrow account, 13690-H; and that the balance of $13.20 was paid to Connoring. The following schedule is a summary of the escrow account, 156-13560-H, covering the sale of the property by the Wallensteins: Source of Deposits
Cash Received
1. Connoring, down payment on con- tract
$ 5,000.00
2. Connoring, for brokers' fees
4,250.00
3. Connoring, for expenses
1,000.00
4. Melchers, transferred for 156-13690-H
50,000.00
5. Home Savings & Loan, loan to Connoring
30,000.00
6. Wallensteins, pro rata share of taxes to 9/21/56
308.50
7. Wallensteins, part of termite con- trol cost 635.00
Total received
$91,193.50
Payees
Cash Paid
1. Wallensteins for deed
$85,000.00
2. Real estate brokers
4,250.00
3. Termite control; $635 by Wallen- steins; $365 by Connoring
1,000.00
4. Loan fee to Home Savings & Loan
300.00
5. Fees for title ins.; deed, recording, notary, etc 42.05
$90,592.05
6. Transferred to escrow 156-13690-H
$ 588.25
7. Balance of account to Connoring Co. 13.20
Total
$91,193.50
The $588.25 was transferred to the account of "(Connoring Corporation) 250 Building Corp, in escrow 156-13690-H", according to the escrow statement. That amount was the total of the accrued taxes on the property, $308.50, and $279.75. On the same *160 day, October 11, the other escrow 156-13690-H was closed under two escrow statements referred to here as A, "To 250 Building Corporation", and B, "To Melcher". Statement A shows the payment of several charges totaling $279.75; increased title insurance $61.25; internal revenue stamps $88; escrow fee for the sale $125; trust deed $4; other fees $1.50. Statement B showed that the Wallensteins' payment through Connoring for accrued taxes $308.50 was transferred to the Melcher escrow, and it also showed the earlier deposit by the Melchers of $50,000, which previously had been transferred to the escrow account in the name of Connoring, 156-13560-H. It also showed the payment of several fees totaling $71 which were charged to the Melchers, which included the buyers' escrow fee of $62.50, and other fees totaling $8.50. The balance, out of $308.50, was paid to the Melchers. Statement B states the following: Cash Received
1. Deposit Doris Day
$50,000.00
2. Accrued taxes to 9/21/56, Wallen- stein 308.50
Total
$50,308.50
Cash Paid
1. Deposited to Connoring Esc. 156-13560-H
$50,000.00
2. Escrow fee charged to Melchers
62.50
3. Fees charged to Melchers, record- ing deed, etc.
8.50
4. Check to Melchers, balance 237.50
$50,308.50
The total amount of cash which was received and paid out in the two escrow accounts, under the three statements of account, was $91,193.50, and no more. As stated above, $90,592.05 was paid to close the sale by the Wallensteins; the balance of $13.20 was paid to Connoring at the end of the closing; $279.75 was paid for fees; 1023 $71 was paid for additional fees charged to the Melchers; and the balance of $237.50 at the closing of the escrow account in the names of 250 Building Corp. and the Melchers, 156-13690-H, was paid to the Melchers. The $237.50 was the balance out of the receipt of $308.50 for accrued taxes, after payment of the fees charged to the Melchers, *161 *10 Summary of Two Escrow Accounts
1. Receipts From:
Melchers
$50,000.00
Connoring
10,250.00
Home Savings & Loan, loan
30,000.00
Wallenstein, accrued taxes
308.50
Wallenstein, termite control 635.00 $91,193.50
2. Payments:
To Wallensteins for deed
$85,000.00
To real estate brokers, paid by C
4,250.00
For termite control:
By Wallenstein $635.00
By Connoring 365.00 1,000.00
For mortgage loan fee by Connoring
300.00
For Fees:
Esc. 156-13560-H $ 42.05 by C
Esc. 156-13690-H 279.75 (A) by C
Esc. 156-13690-H 71.00 (B) by M
392.80
Payments of balances of cash on hand:
Esc. 156-13560-H to Connoring $ 13.20
Esc. 156-13690-H to Melchers 237.50
250.70
Total $91,193.50
In the purchase of the Wallenstein property, and in the closing of the sale, Connoring advanced the net sum of $10,236.80 (after receiving a refund from the escrow of $13.20): Paid and advanced by Connoring
Deposit under purchase agreement
$ 5,000.00
Payment of brokers' fees
4,250.00
Payment of mortgage loan fee
300.00
Paid for termite control
365.00
Escrow fees, 13560-H
42.05
Escrow fees, 13690-H 279.75
$10,236.80
In form, the Connoring-250 Building Corporation purportedly made a "resale" of the Wallenstein property to the Melchers on about September 25, 1956, for $110,000. *162 Connoring had entered into an agreement to purchase the property from the Wallensteins in an arm's length transaction for $85,000 on August 13, 1956. There is no evidence that between August 13 and September 25, 1956, the fair market value of the property had increased to any amount in excess of $85,000. Connoring was effectively controlled by Rosenthal and Norton (attorneys for the Melchers), and the Melchers, all of whom owned 50 percent of its stock. There is no evidence about the other stockholders. The evidence does not show that the three above-named stockholders did not exercise effective control over Connoring. There were four members of Connoring's board of directors. Rosenthal, Norton, and Martin Melcher were the majority members of the board. Connoring's purported sale of the Wallenstein property to the Melchers for $110,000 was not an arm's length transaction. The resolution of the directors authorizing Connoring to carry out a "resale" of the Wallenstein property, on such terms as would be agreed upon by the officers of the corporation and the purchasers, was adopted at the same meeting on August 11, 1956, when the other resolution was adopted authorizing the corporation *163 to purchase the property from the Wallensteins. That is to say, the authorization to "resell" the property was not connected with any external evidence of any actual increase in the fair market value of the property as of some time after the contemplated sale to Connoring by the Wallensteins. The purported resale of the property to the Melchers for the purported amount of $110,000 was to be carried out as follows: No cash was to be paid by the Melchers, at the time of the closing of this alleged transaction, toward the "purchase price". The $50,000 which the Melchers paid into the Melchers' escrow account by a check dated September 25, 1956, was not to be applied to the purported purchase price of $110,000, and the $50,000 was not to be applied, either, in the purchase of the property from the Wallensteins, although in fact it was used in paying $85,000 to the Wallensteins through the escrow in the name of Connoring. The closing of the purported "resale" by Connoring to the Melchers was to be on October 11, 1956, almost simultaneously with the closing of the escrow with the Wallensteins. The purported "purchase price" of $110,000 was to be paid by the Melchers by their assumption *164 of the note of Connoring for $30,000 payable to the Home Savings and Loan; and by giving their note for $80,000 to 250 Building Corp., the total of both being $110,000. However, nothing was to be paid on the note for $80,000 until 15 years later. 1024 The Melchers executed a promissory note for $80,000, dated September 25, 1956, payable in 15 years to 250 Building Corp., bearing 6 1/3 percent interest payable annually. The note did not provide for the payment of any annual installments of the principal amount of the note, and it did not state that interest could be prepaid. The note was secured by a second mortgage (deed of trust) dated September 25, 1956, executed October 4, 1956, described hereinbefore, of which 250 Building Corp. was the beneficiary. The Melchers paid $26,000 to 250 Building Corp. by a check dated October 23, 1956. They deducted $76,000 on their 1956 income tax return as "interest". The $76,000 had been paid to 250 Building Corp. in two installments represented by the Melchers' check for $50,000 dated September 25, 1956, deposited in escrow account 156-13690-H, and by the check for $26,000 dated October 23, 1956. The $76,000 purportedly was a prepayment in 1956 *165 of "interest" for 15 years on the Melchers' note for $80,000. There is no evidence that the corporation gave the Melchers a receipt for a prepayment of 15 years' interest. No notation to that effect was made on the note. The respondent disallowed the claimed deduction of $76,000 on the ground that it was not a payment of interest on indebtedness. In its tax return for the fiscal year ended March 31, 1957, the 250 Building Corp. reported net profit for its operations of $13,875.03, and a capital gain from a transaction of $10,329 (not material here). It reported gross income from the sale of "property held for resale" (the Wallenstein property). With respect to that property, it reported the receipt of a first mortgage $30,000; a second mortgage $12,000 (described hereinafter, the amount paid by Rosenthal to the Terrance Paul Melcher Trust in exchange for the Melchers' note in the amount of $80,000); and "interest" $76,000; a total of $118,000. The corporation allegedly had resold the Wallenstein property to the Melchers for $110,000, but in the corporation's tax return, the total receipt for such "resale" was reported as the receipt of $30,000 (from the Melchers' assumption of the *166 first mortgage note for $30,000), and $88,000, or $118,000, as described above. However, in the corporation's tax return, the "cost" of the property held for resale was stated to be $89,571.80. The corporation's tax return is not clear. The substance of the transaction was that the Connoring-250 Building Corp. was merely a conduit through which the Melchers purchased the property from the Wallensteins. Although two escrow accounts were used, in substance they represented one escrow through which the Wallenstein property was transferred by deed from the Wallensteins to the Melchers. Funds were transferred from one escrow account to the other. The escrow account 156-13690-H, in the names of the Melchers, was merely a device for a purported "resale" of the property by 250 Building Corp. to them for the purported price of $110,000. For the two escrow accounts there were three statements of account, as described above, but there was in substance only one statement of account in which the total receipts and disbursements totaled $91,193.50. In substance, the Melchers, through the escrow paid $50,000 to the Wallensteins, which was part of the sale and purchase price of $85,000. In substance *167 and reality, the Melchers, through Connoring, paid $85,000 for the Wallenstein property, represented by their cash payment of $50,000, a cash deposit of $5,000 advanced for them by Connoring, and the Melchers' assumption of Connoring's note for $30,000 payable to Home Savings and Loan, total $85,000. In substance and reality, the Melchers' payment of $26,000 to 250 Building Corp. on October 23, 1956, represented their reimbursement to Connoring-250 Building Corp. of the $10,236.80 which that corporation had advanced for them and paid into escrow account, 156-13560-H, in the name of Connoring (described above), and had spent for them through escrows 156-13560-H and 156-13690-H; plus a fee to the corporation of $15,763.20 (total $26,000) for its services in providing the mechanics for and appearance of a "resale" of the property to the Melchers for $110,000, through escrow 156-13690-H. The purported "resale" of the property to the Melchers for the alleged $110,000 was lacking in substance, was not an arm's length transaction, and was a sham and device for the purpose of providing a basis for the purported "prepayment" of $76,000 as 15 years' "interest" on the purported promissory note *168 of $80,000, and for the facade for the claimed deduction for "interest" of $76,000. 1025 The alleged promissory note for $80,000 payable at the end of 15 years after September 25, 1956, was held by 250 Building Corp. only for a few months, as follows: On December 26, 1956, the Melchers executed a trust agreement creating a trust for the benefit of their son, Terrance Paul Melcher, of which Jerome B. Rosenthal, their attorney, was the trustee. The provisions of the trust agreement are not material here; Terrance was the beneficiary of the trust income and eventually of the trust corpus. The Melchers paid $12,000 into the trust. On February 25, 1957, Rosenthal, as trustee, paid $12,000 to 250 Building Corporation for the Melchers' note for $80,000, and the corporation assigned the note and the deed of trust (second mortgage on the property formerly owned by the Wallensteins) to the Terrance Paul Melcher trust. By this transaction, the corporation purportedly "sold" the note for $80,000 to the trust for $12,000. Ultimate Findings of Fact Issue 1: Land Bank Bonds Melcher did not in fact purchase any Federal Land Bank bonds on March 11, 1953, and there was no sale of bonds on September *169 6, 1957, which he had purchased. The purported transaction was no more than a paper transaction, evidenced by bookkeeping entries, which was lacking in substance and reality. The alleged transaction in $3,000,000 Land Bank bonds was a sham transaction which was devised to provide the basis for claiming tax deductions for purported "interest" on an alleged indebtedness. The intent and purpose of all of the parties involved was the creation of deductions for tax purposes through a transaction which in form would appear to create an indebtedness but which in fact was lacking in substance and bona fides apart from tax purposes. The petitioner, Melcher, did not borrow any money from Gibraltar, and none was borrowed for or loaned to him, in any amount, neither $2,888,333.34, nor $267,666.66, nor $3,156,000. Melcher's notes dated March 11, 1953, and October 1, 1955, were not evidence of a bona fide debtor-creditor relationship or of an indetbedness in any amount. Melcher's periodic payments to Gibraltar pursuant to the provisions in the notes were not payments of interest on indebtedness, and were not payments for the use of money. Melcher and Gibraltar merely exchanged checks during the *170 years 1953-1957 with respect to the purported payment of "interest" on Melcher's notes. The result was that to the extent that Gibraltar's checks to Melcher off-set parts of Melcher's checks to Gibraltar, Melcher did not make any payments of the so-called note "interest", and his actual payments to Gibraltar were only the net amounts by which the amounts of his checks exceeded the amounts of Gibraltar's checks which was $110,718.81. No Land Bank bonds were in fact collateral for Melcher's notes. Gibraltar did not receive any coupon interest on any Land Bank bonds. Gibraltar's checks to Melcher for alleged bond interest represented refunds to Melcher of some of the amounts of Melcher's payments to Gibraltar, and Gibraltar's credits to Melcher's account for alleged bond interest were merely bookkeeping entries. Melcher did not receive any interest or income from any Land Bank bonds during the taxable years, and he did not realize any capital gain in 1957 from the paper transaction. Apart from anticipated tax benefits, there was no reasonably expected profit or economic gain from the transaction which purportedly involved a "loan" of $3,156.000 and Gibraltar's charges of $347,993.05 on *171 the first "note", and $131,746.59 on the second "note", a total charge of $479,739.64. The transaction was not one which was entered into for profit, and Melcher's net expense, or out-of-pocket expense of $115,406.21 was not a loss from a transaction entered into for profit. No deduction is allowable for such net expense. The transaction did not represent in any respect a unilateral contract giving Melcher an option to purchase $3,000,000 Land Bank bonds, and there was no intention of any of the parties involved that such option was given to Melcher to be exercised, if he so desired, independently and apart from the general arrangements. Gibraltar did not have its own funds with which to make a loan at any time to Melcher of funds for the actual purchase of the bonds, and Gibraltar did not intend to obtain an actual loan of such funds from any outside source for such purpose. Since the entire transaction for the purported purchase of $3,000,000 of bonds was a sham, without substance and reality, the element of an "option" to purchase the bonds cannot be implied or read into the transaction. Therefore, the net out-of-pocket expense of $115,406.21 to Melcher was not a loss attributable *172 to a failure to exercise an option to buy or sell property. 1026 Issue 2: The Wallenstein Real Estate The petitioners in fact purchased the Wallenstein property for $85,000. They supplied $50,000 in cash toward that sale price; and they reimbursed the Connoring-250 Building corporation for the additional cash payment of $5,000, for the broker's fees of $4,250, for the first mortgage loan fee of $300, and for all of the expenses incident to obtaining the deed to the property through the escrow account. The petitioners repaid to the corporation the sum of $10,236.80 for the cash advanced by it in closing the transaction with the Wallensteins. Petitioners and their attorneys exercised effective control over the Connoring-250 Building corporation for the purpose of the transaction with the Wallensteins. Connoring was merely a conduit through which the petitioners purchased the property, which had a fair market value of $85,000. The purported "resale" of the property to petitioners by the Connoring-250 Building corporation for $110,000 was a sham transaction lacking in substance and reality. At the time of the purported "resale" agreement, the property did not have a fair market value *173 of $110,000. A genuine, bona fide indebtedness of $80,000 was not created by the purported "resale" agreement, and petitioners' note for $80,000 was not evidence of a bona fide indebtedness of the petitioners. The petitioners did not in fact and in substance make a prepayment in 1956 of interest on an indebtedness of $80,000. The petitioners paid a fee to the corporation, out of a payment of $26,000 on October 23, 1956, of $15,763.20 for its services in providing the arrangements for the purporter "resale" of the property for $110,000 represented in the larger part by the "note" for $80,000; and for the facade for a purported prepayment of "interest" of $76,000, in a tax-motivated transaction having no reality or substance. In substance, there was only one transaction involving the Wallenstein property. It consisted of the transfer of the deed of title thereto to the Melchers in exchange for the payment of $85,000 to the Wallensteins. The one transaction was financed by the Melchers' cash payments of $55,000, and a purchase-money mortgage loan of $30,000 by Home Savings and Loan, which was borrowed for the benefit of the Melchers, who assumed that indebtedness. The costs to the Melchers *174 in acquiring the property through the one transaction totaled $5,236.80, as follows: Brokers' fees, $4,250; mortgage loan fee, $300; termite control cost, $365; and miscellaneous charges incident to obtaining the title through escrow, recording fees, etc., $321.80. The escrow fee of $71, paid by the Melchers, was an expense of the purported "resale" transaction in the name of 250 Building Corporation, for which the Melchers paid the corporation a fee of $15,763.20, so that the Melchers' total expense for the purported "resale" to themselves was $15,834.20, which was an expenditure for an anticipated tax benefit. The purported "resale" selling price of $110,000 represented an addition of $25,000 to the fair market value of the property established on August 13, 1956. There is no evidence that there was in reality a $25,000 increase in the fair market value of the property within 43 days, on September 25, 1956, after the arm's length, negotiated sale of the property on August 13. There was not any negotiation of the purported "resale" price of $110,000 in an arm's length negotiation between independent parties, and $110,000 did not represent the fair market value of the property on September *175 25, 1956. The purported "resale" price of $110,000 was an arbitrary figure arrived at by the officers of a controlled corporation, 250 Building, and the Melchers, for the purpose of a tax-motivated transaction. Apart from the motive of obtaining a deduction of $76,000 as "prepaid interest" on a purported "indebtedness" of $80,000, there was no substance to the transaction between 250 Building and petitioners. Opinion Issue 1: Federal Land Bank Bonds: Deductions for Payments of Alleged Interest; or, in the Alternative, for Loss A. Deductions Claimed as Interest. The main question under this issue is whether there was a real and bona fide "indebtedness" of Melcher to Gibraltar of $3,156,000, evidenced by two promissory notes, so that payments made by Melcher to Gibraltar in the years 1953-1957, as "interest" on the purported "loan", constituted interest paid on indebtedness within the meaning of section 23(b) 1939 Code, and section 163(a), 1954 Code. [4] The "interest" deduction taken 1027 in each of the years 1953-1957 for payments made to Gibraltar was disallowed by respondent upon his determinations that the payments were not "interest paid on indebtedness" within the provisions of *176 the applicable sections of the Internal Revenue Code, and that they were not deductible under any other provisions of the Code. There are two additional questions for decision under Issue 1, to be considered as alternative grounds for claimed deductions. Petitioner has presented arguments, also, about procedural matters, or issues. For convenience, our considerations and conclusions with respect to the procedural questions, and about the evidence, are set forth after our discusisons of the alternative claims for deductions. Some of the procedural contentions of the petitioner relate to the burden of proof. Our conclusion is that the petitioner had the burden of proof under all of the issues, including the questions involving the claimed deductions connected with the purported transaction in Federal Land Bank bonds. Max Barnett, 44 T.C. 261, 276 (1965), affd. 364 F. 2d 742 (C.A. 2, 1966); Rule *177 32, Rules of Practice of this Court. It is an established rule of law that "interest on indebtedness", as used in the statute, means "compensation for the use or forbearance of money", Deputy v. Du Pont, 308 U.S. 488, 498 (1939). It has been defined, also, as "the amount which one has contracted to pay for the use of borrowed money." Old Colony R.R. Co. v. Commissioner, 284 U.S. 552, 560 (1932). The term "indebtedness", as used in the statute, has been defined as "an unconditional and legally enforceable obligation for the payment of money." Autenreith v. Commissioner, 115 F. 2d 856, 858 (C.A. 3, 1940); Commissioner v. Park, 113 F. 2d 352, 354 (C.A. 3, 1940); Gilman v. Commissioner, 53 F. 2d 47, 50 (C.A. 8, 1931). Upon due consideration of all of the evidence, our conclusion and findings are that Melcher did not "contract to pay for the use or forbearance of money." The use of money was never a right of Melcher in all of the transaction and arrangements, and no loan was made to him. The elaborate transaction can best be described as a sham within the rule of Goodstein v. Commissioner, 267 F. 2d 127 (C.A. 1, 1959), affirming 30 T.C. 1178; Lynch v. Commissioner, 273 F. 2d 867 (C.A. 2, *178 1959), affirming 31 T.C. 990; Knetsch v. United States, 364 U.S. 361 (1960); and Kapel Goldstein, 44 T.C. 284 (1965), affd. 364 F. 2d 734 (C.A. 2, 1966). These cases, on their facts, are indistinguishable in principle from the substantial number of cases which have held that payments of purported "interest" on alleged "loans" were not interest on indebtedness and, therefore, were not deductible. Knetsch v. United States, supra; Sammy Cahn, 41 T.C. 858 (1964), affd. 358 F. 2d 492 (C.A. 9, 1966); Williams v. Commissioner, 323 F. 2d 656 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court, Amor F. Pierce, 37 T.C. 1039 (1962), affd. 311 F. 2d 894 (C.A. 9, 1962); Danny Kaye, 33 T.C. 511 (1959), affd. 287 F. 2d 40 (C.A. 9, 1961); Gordon MacRae [Dec. 24,128], 34 T.C. 20 (1960), remanded on another issue, 294 F. 2d 56 (C.A. 9, 1961), certiorari denied 368 U.S. 955; Goodstein v. Commissioner, supra; Sonnabend v. Commissioner, 267 F. 2d 319 (C.A. 1, 1959), affirming a Memorandum Opinion of this Court; Lifschultz v. Commissioner, 393 F. 2d 232 (C.A. 2, 1968), affirming a Memorandum Opinion of this Court; Beneson v. United States, 385 F. 2d 26 (C.A. 2, 1967); Max Barnett, 44 T.C. 261 (1965), *179 affd. 364 F. 2d 742 (C.A. 2, 1966), certiorari denied 385 U.S. 1005; Kapel Goldstein, supra; Minchin v. Commissioner, 335 F. 2d 30 (C.A. 2, 1964), affirming a Memorandum Opinion of this Court; Jockmus v. United States, 335 F. 2d 23 (C.A. 2, 1964); Becker v. Commissioner, 277 F. 2d 146 (C.A. 2, 1960), modifying a Memorandum Opinion of this Court; Lynch v. Commissioner, supra; Leslie Julian, 31 T.C. 998 (1959), affd. 273 F. 2d 867 (C.A. 2, 1959); Carl E. Weller, 31 T.C. 33 (1958), affd. 1028 270 F. 2d 294 (C.A. 3, 1959), certiorari denied 364 U.S. 908; W. Stuart Emmons, 31 T.C. 26 (1958), affd. 270 F. 2d 294 (C.A. 3, 1959); Joseph H. Bridges, 39 T.C. 1064 (1963), affd. 325 F. 2d 180 (C.A. 4, 1963); Perry A. Nichols, 37 T.C. 772 (1962), affd. 314 F. 2d 337 (C.A. 5, 1963); United States v. Roderick, 290 F. 2d 823 (C.A. 5, 1961); Gheen v. Commissioner, 331 F. 2d 470 (C.A. 6, 1964), affirming a Memorandum Opinion of this Court; Knowles Electronics, Inc. v. United States, 365 F. 2d 43 (C.A. 7, 1966); Lewis v. Commissioner, 328 F. 2d 634 (C.A. 7, 1964), affirming a Memorandum Opinion of this Court, certiorari denied 379 U.S. 821; Dooley v. Commissioner, 332 F. 2d 463 (C.A. 7, 1964), *180 affirming a Memorandum Opinion of this Court; Rubin v. United States, 304 F. 2d 766 (C.A. 7, 1962); Rothschild v. United States, 407 F. 2d 404 (Ct. Cl. 1969); Brown v. United States, 396 F. 2d 459 (Ct. Cl. 1968); Oritt v. United States, 357 F. 2d 692 (Ct. Cl. 1966); Broome v. United States, 170 F. Supp. 613 (Ct. Cl. 1959); Carl Shapiro, 40 T.C. 34 (1963); A.A. Helwig, 37 T.C. 1046 (1962); William R. Lovett 25,319], 37 T.C. 317 (1961); Morris R. DeWoskin, 35 T.C. 356 (1960). Except for immaterial variances as to names, amounts, the securities, and the forms of the transactions, the cases under consideration come within the reasoning of the cases cited above and the holdings that certain transactions were a sham. In Knetsch, supra, it was held that amounts claimed as "interest" could not be deducted where the transaction which gave rise to the claimed deduction was a sham. See Morris R. DeWoskin, supra; Gordon MacRae, supra; Rubin v. United States, supra. In these cases considerable attention was given to form, and petitioners rely heavily upon the form of each step taken. However, we do not find any difference in the substance of the transaction in Land Bank bonds in these cases upon *181 making comparisons with the cases cited above. The findings, conclusions, and decisions in the cited cases were arrived at because the substance of each of the respective transactions in issue in each of those cases differed from its form. In these cases, the divergence of substance from form is as great or greater than in the cited cases. We find no significant difference between the facts of this case and those of Gordon MacRae, supra, after carefully and fully considering the evidence here, and all of petitioners' assertions, contentions, and arguments in their lengthy briefs. All of the cases cited by petitioners have been considered. L. Lee Stanton, 34 T.C. 1, is distinguishable from these cases. In Stanton the Commissioner conceded that the transactions in issue were bona fide and real, and that they created genuine indebtedness. He has not made any of those concessions in these cases. In Stanton this Court concluded that the taxpayer undertook to run the risk of the rise and fall of the market. We cannot make that conclusion here. See Max Barnett, supra, p. 281. It is recognized here, as was done in Knetsch v. United States, supra, affirming 348 F. 2d 932 (Ct. Cls.) that one *182 of the principles stated in Gregory v. Helvering, 293 U.S. 465, is that a taxpayer has a right to decrease the amount of what otherwise would be his taxes, or altogether avoid them, if he employs "means which the law permits", and that rule has been considered in these cases. However, the related rule is equally well settled that in instances of the type such as is in issue here "the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended." Gregory v. Helvering, supra. That rule of law requires that we first look beyond the form in which the transaction in question was cast. Under the statute involved here, the petitioners may prevail "only if the payments in question were in fact and in substance interest, i.e., consideration paid for the use and forbearance of money. Cf. Deputy v. Du Pont, 308 U.S. 488." See Gordon MacRae, supra, p. 26. The statutory provisions involved here, sections 23(b), 1939 Code, and 163(a), 1954 Code, pertain to a type of allowable deduction. Deductions are matters of legislative grace, and to obtain the benefit of a statute permitting a deduction of a specified type, the taxpayer must prove *183 and establish that his 1029 claimed deduction comes within the provisions and specifications of the statute. As has been restated recently in Brown, et al. v. United States. - F. 2d -, (May 15, 1970, Ct. Cls.), where a taxpayer "attempts to use the tax system to obtain a benefit or advantage where the only possibility of any real benefit or advantage comes through the tax mechanism itself", and where "there would be no substantial benefit or advantage through the transaction alone, apart from the operation of the particular tax mechanism employed by the taxpayer," the courts should examine carefully such attempts. "Such attempts may not always be rejected per se, but we think that a universal precondition of acceptance for tax purposes is that the taxpayer 'turn square corners' and fulfill every legislative requirement of tax law, correctly construed." Knetsch v. United States, supra, is not favorable to petitioners' claims in these cases but to the contrary supports the respondent's determinations. See Rubin v. United States, supra, p. 770, where the court noted that Knetsch is not inconsistent with the cases cited by the Government. Cases cited by the petitioners, such as the following, *184 are distinguishable from these cases because in them the courts found the transactions to be in substance what they appeared to be in form and to have commercial reality: Maysteel Products, Inc. v. Commissioner, 287 F. 2d 429, reversing 33 T.C. 102; and Fabreeka Products Co. v. Commissioner, 294 F. 2d 876, reversing 34 T.C. 290. See Max Barnett, supra, p. 281, where the same observation was made. On the authority of the decisions of the cases cited above (in the long list set forth at the beginning), the question is decided for the respondent. In view of the assertions and contentions of the petitioners in their lengthy briefs, it is advisable to discuss the facts, and the substance of the transaction in question, which purported to involve $3,000,000 of Federal Land Bank bonds. Further discussion is necessary because of the diametrically opposite views, of the substance of the purported transaction, of the petitioners and the respondent, respectively, particularly because the petitioners contend that the form and the various steps of the transaction were in substance what they appeared to be in form. The ultimate question and the subsidiary questions are questions of fact. In parts *185 of the petitioners' assertions on brief, there are several examples of their failure, whether or not deliberate and obtuse, to recognize important facts and distinctions; and there is a tendency, whether or not intentional, to obfuscate the real facts underlying some of the steps employed in the transaction. Moreover, our task in clearly making the findings has been an exceedingly tedious and time-consuming undertaking because the seemingly simple structure of the transaction and of the provisions in the promissory notes given to Gibraltar were far from simple and uncomplicated. It should be made clear that the many schedules set forth in the findings are the result of this Court's diligent and careful analysis of the relationship of one step to another, and of the necessary comparisons of steps followed by Gibraltar with steps followed by petitioners, particularly with respect to the steps followed by Gibraltar in making payments to Melcher, with which, of course, he was entirely cognizant. The obligation of this Court to look through form in order to ascertain substance, so that the realities and substance of the steps employed as well as of the entire transaction would emerge, has *186 not been an easy task to execute. The design and structure of the underlying plan of the transaction, including the promissory note to Gibraltar which in the principal amount included a so-called "reserve", were in many ways ingenious in their employment of the form of certain commercial and financial procedures. Descriptive labels were used, such as "short sale" which were not real at all in substance. There was not a "short sale" on March 11, 1953, for example, of Land Bank bonds, and to describe what was done as a "short sale" was an artifice and subterfuge in itself. In order to understand the ingenuity of the general plan and of the separate steps employed, there must be an understanding of the evidence and of its significance which reflects understanding of the mechanics and procedures of those who are engaged in executing securities transactions. The fact that Cantor, Fitzgerald (C-F) and Gibraltar were closely related, although separate, entities, that both were dealers in securities, and that each one had as its clearance agent in New York, the Chemical Bank and the Irving Trust Company, respectively, which in their other and 1030 major activities are actually engaged in the *187 procedures of clearance agents in real securities transactions, created a trompe l'oeil which at first might fool the eye. There was a great deal of eye-foolery in the steps which were employed, so that what was nothing at all appeared to have substance and to be a customary procedure in the business of buying and selling securities, of "delivering" them "against payment", and of "borrowing" securities to make a "short sale" of them. The transaction on its face had the appearance of the use and employment of money in substantial amounts, but relatively little money was employed. Real transactions in the buying and selling of securities involve much paperwork and many bookkeeping entries. In the transaction in dispute, and in the steps employed, only the paperwork and the bookkeeping entries were real, not the purported use and borrowing of money, and not the purported acquisition of the Land Bank bonds. That the whole device and framework of the transaction were ingenious is demonstrated by the lengthy Findings of Fact and the many illustrative schedules of figures in the findings, which have been derived from the evidence as the result of a lengthy and tedious examination and analysis *188 of the evidence by this Court, which counsel for the respective parties were not industrious enough to supply. This Court, having worked out the findings, with the schedules, might find it sufficient to dispose of the questions involved simply by referring to the findings as dispositive of the ultimate question for decision, with the observation that petitioners' assertions and contentions are wholly lacking in merit. But it appears to be advisable to discuss and comment on some of the mechanics used in the transaction, so that the "eye-catching trompe l'oeil", or the deceptions, will not persist. Furthermore, since the petitioners have engaged in the exercise on brief of attempting to distinguish these cases from the decided cases in which the transactions which were not recognized for tax purposes were almost the same or closely similar to the transaction in dispute here, we must laboriously repeat here the analyses in the typical authorities which are controlling, even though in doing so we are obliged to largely quote from them. 1. The evidence shows that on or about March 11, 1953, C-F and Gibraltar, respectively, did not borrow $2,888,333.34 in connection with an order to purchase *189 $3,000,000 Land Bank bonds due October 1, 1957, the total charge according to C-F's "purchase" $3,000,000 of the same bonds due October 1, 1957. Childs executed the sell order at the market price of 95-13/32, 1/32 of 1 point less than that at which the buy-order was carried out at 95-14/32. In effect, the sell order neutralized the buy-order except that the "selling price" of $2,885,520.84 was $2,812.50 less than the "purchase price" charged to C-F in its account with Chemical. In effect, to be literal, the "purchase price" of bonds covered by C-F's order to buy was "paid" through the mechanics of Gibraltar's simultaneous order to "sell" because the "selling price" was almost the same amount as the "purchase price". To be literal, one might describe the mechanics as meaning that the bonds paid for themselves in a simultaneous "In" and "Out" mechanics, both done on the same day. The "In" and "Out" transactions were in effect paper transactions carried out by the respective bookkeeping entries of Chemical and Irving Trust in the respective accounts of C-F and Gibraltar. C-F's account with Chemical was charged $2,888,333.34, and by virtue of a credit to Chemical from Irving of the same *190 amount the item was closed with respect to C-F. Irving charged Gibraltar's account $2,888,333.34 for its credit to Chemical in that amount. Irving also credited Gibraltar's account with the "selling" price reported by Childs, $2,885,520.84. There was a net charge to Gibraltar on Irving's books of the excess of the debit over the credit, $2,812.50. That was the only actual "money" or "the funds" used in the "In" and "Out" mechanics on March 11, 1953. 1031 There may have been a physical transfer of $3,000,000 of bonds to Chemical, (the "In") and then a physical transfer from Chemical to Irving, and from Irving to Childs (the "Our"); but on the other hand, there may not have been any physical transfer of the bonds. Unlike transfers of shares of corporate stock, which are effected by the recording thereof on the corporation's stock records, government bonds can be "transferred" between or among dealers and clearance agents by debits and credits to their respective accounts pursuant to order slips of the clearance agents "to deliver against payment", or "to receive against payment". The evidence does not show any more than the paper aspects consisting of order slips. But it is immaterial *191 which way the "In" and the "Out" mechanics were carried out because whether or not there was a "movement" of the Land Bank bonds, there were and there had to be the paper and bookkeeping procedures, consisting of the orders to deliver or receive "against payment", and the respective "pairs" of debits and credits in C-F's running account with Chemical and Gibraltar's running account with Irving. No money was required; only the net charge to Gibraltar of $2,812.50 was involved. Standard and customary mechanics of the securities market were utilized by C-F and Gibraltar in purporting to make a short sale on March 11. They were dealers and the mechanics were available to them. Short sales may be an everyday procedure in the securities market, and to borrow securities in making a short sale, with this exception: In a real short sale, the cost of the security is paid by or for the person who makes the purchase of the government security, because in an actual transaction the person who makes the purchase of a government security ordinarily does not make a simultaneous sale thereof. There is no evidence that anyone put out $2,888,333.34 in cash for Melcher on March 11, 1953; neither C-F nor *192 Gibraltar did so. If any cash was used, as opposed to bookkeeping entries, it came through C.F. Childs & Co. in the course of Childs' sale, less $2,812.50 supplied by Gibraltar's line of credit with Irving Trust. C-F and Gibraltar were in a position as dealers to utilize the above-described mechanics on behalf of their client, Melcher, to "purchase" $3,000,000 Land Bank bonds without using any money. There was no "forbearance" or "use" of borrowed money. There was no borrowing of money from a bank secured by a physical pledge of securities as collateral. Compare Max Barnett, supra, p. 265; Lifschultz v. Commissioner, supra, 393 F. 2d 232, 233; and similar cases where bank loans were actually involved in transactions similar to this one. In the mechanics utilized here, there was no formal "bank" loan by either Chemical or Irving, the clearance agents, but if it could be said that Chemical or Irving did make a "loan" to C-F or to Gibraltar, such "loan" was only for a few hours on March 11, 1953. Counsel for petitioners contend that Gibraltar "borrowed" the bonds from Melcher's account on March 11, 1953, and made a "short" sale thereof. That argument is merely sophistry. In reality there *193 was not a "short" sale of the bonds. Gibraltar never had possession of them and, of course, Melcher did not. In a real "short" sale some one owns the security and has paid for it, or at least he has the indicia of the ownership of the security so as to be able to loan the security to some one who wants to make a real short sale. See J. George Gold, 41 T.C. 419, 427. However, it is not necessary to be technical about the purported "short" sale. Perhaps in form, according to another mechanics of the securities market there was a "short" sale. Nevertheless, in substance there was not one. The bonds had, in substance, simply gone "In" and "Out" of the respective accounts of C-F and Gibraltar with their respective clearance agents, as described above. In Gordon MacRae, supra, pp. 26-27, this Court, taking notice of normal business transactions (p. 26), dealt with form versus substance by observing (p. 27): The steps taken, each in itself a legitimate commercial operation, were here each mirror images, and add up to zero. The varius purchases and sales, each real without the other, neutralize each other and fairly shout to the world the essential nullity of what was done. No purchase and *194 no sale is essentially identical with what was done here, i. e., identical and virtually simultaneous purchases and sales. The choice of the more complicated and involved method of doing nothing had no purpose, save the erection of the facade upon which petitioners now seek to rely. The exactly same observation applies here. In Goodstein v. Commissioner, supra, p. 131, the court concluded (as quoted in MacRae, p. 27) that "there was never in substance either a purchase of the notes by the taxpayer or borrowing of the purchase funds 1032 from Seaboard." The exactly same conclusion is made here. In Rubin v. United States, supra, p. 770, under similar facts, the court concluded that, "In reality, this paper transaction setting up the 'loan' did not involve any Treasury notes owned either by taxpayer or Seaboard or any real money represented by the 'loan'. * * * No Treasury notes were delivered by taxpayer or Livingstone to Seaboard for collateral. Moreover no money was actually advanced * * *." Exactly the same observations must be made here under the facts in these cases. In MacRae v. Commissioner, supra, affirming this Court, the Court of Appeals for the Ninth Circuit agreed, p. 58, *195 with this Court's conclusions that the transaction there (closely similar to the one here) "did not give rise to any purchases of Treasury notes or Federal Land Bank bonds for the taxpayer." In Rothschild v. United States, supra, the evidence showed (p. 408) that Treasury notes "were purchased with borrowed money," but there was a bank loan involved, which is not the case here. In Perry A. Nichols, supra, p. 788, this Court concluded, "In the existent case, * * * there was no actual purchase of Government securities"; and in the footnote on page 788, the mechanics employed are described, closely similar if not the same as here, and we observed "the Treasury notes in fact never left the bond dealers' offices." In Morris R. DeWoskin, supra, the mechanics employed were the same as here, and we held that the transaction was a sham, namely, that no Treasury notes were purchased (pp. 358-359). In these cases, it is advisable to dispose first of petitioners' contention that there was in substance and in fact a purchase of $3,000,000 Land Bank bonds on March 11, 1953, for Melcher's account, because petitioners rely upon such purported purchase of bonds as the basis for their claim that a bona *196 fide loan was made to Melcher for which the original note to Gibraltar was evidence of an actual loan and borrowing of money. However, if it is concluded and found that no Land Bank bonds were purchased, that there were no bonds involved at all in the purported transaction, then it follows that the transaction was a sham, and that absent a purchase of bonds, there was not in fact any loan of any money to Melcher. Our finding and conclusion are that there were no Land Bank bonds involved, none were purchased for Melcher's account, the "In" and "Out" mechanics on March 11 made the purported, or monetary, transaction a nullity. It follows that there is no basis left upon which petitioners can rest their claim that money was loaned to Melcher and used in a real and bona fide "purchase" of bonds. It also follows that there was no "borrowing" of bonds in any "short" sale or in any dealing with so-called "third parties." It follows, further, that the note of Melcher to Gibraltar for $3,156,000 was not evidence of a bona fide debtor-creditor relationship between Melcher and Gibraltar. And it follows also that in 1957 there was not a "sale" of any bonds purchased and held for Melcher, and that *197 Gibraltar was without any basis for giving its checks to Melcher as payments to him of the "interest" on bonds bought and held for his account. The holding here is that the entire transaction must be considered in order to determine whether the transaction in despute was in substance what it appeared to be in form, and whether it had commercial reality. As in MacRae, p. 26, we may not thus fragmentize the transaction here under consideration "and view each step thereof as though independent of those which went before and those which followed." (Emphasis added.) The conclusion is that when the whole transaction is considered, rather than each particular step, there was in substance and reality only a paper transaction; it did not involve any Land Bank bonds owned either by Melcher, or C-F, or Gibraltar; it did not involve any real money; there was not a borrowing or a lending by or to Melcher; there was no real and bona fide loan to Melcher of $2,888,333.34, and the promissory note to Gibraltar for $3,156,000 was not evidence of a loan to or for Melcher. These findings and conclusions are dispositive of the point that no Land Bank bonds were purchased or involved. However, that factor *198 is not the only factor determining that the purported transaction was a sham. It is of particular significance in these cases that the promissory notes to Gibraltar, executed by Melcher, were a sham, and that the arrangements for Melcher's payments to Gibraltar under the two notes of purported "interest" on the notes were evidence of the general artifice and subterfuge. Petitioners rely heavily on the 1033 point that in form the recourse notes in and of themselves established the existence of a debtor-creditor relationship between Melcher and Gibraltar. With that contention we cannot agree upon the facts here. Moreover, it is elemental that the mere execution of a promissory note does not establish the existence of an indebtedness. It has been concluded that the paper transaction in bonds did not involve the use or the loaning of money. It follows that since there was no use of forbearance of money, the promissory notes in themselves were a nullity. 2. We now turn to other aspects of the transaction. Gibraltar provided Melcher with a printed form of note which he executed. Dated March 11, 1953, the note recited that Melcher "agreed" to pay Gibraltar, "for value received," $3,156,000 *199 on October 1, 1955. Gibraltar did not actually pay any funds to petitioner or to C-F. The record indicates that Gibraltar did not have the funds. It had been incorporated, according to the record here, early in 1953 with paid in capital of $2,000. From what source would Gibraltar have paid $3,156,000 to Melcher? We have concluded above that in fact and reality no Land Bank bonds were purchased on March 11. The face amount of the note was $267,666.66 more than the "purchase" slip of C-F showed as the "charges" for the bonds, $2,888,333.34. In and of itself, the "note" did not create and establish a debtor-creditor relationship. There was no legal consideration for the note within the context of what happened on March 11 with respect to the purported "purchase" of the bonds. The significance of the note is not to be determined in a vacuum, and on the basis of the terms and provisions of the note per se, without taking into account the relationship of the "note" to the aborted "purchase" of bonds on March 11, and to the fact that no bonds were purchased. The bookkeeping entries on Gibraltar's books, in connection with the execution of the note, charging Melcher with $3,156,000 cannot *200 be regarded as establishing the existence of a real indebtedness. Bookkeeping entries, although evidence of the facts which they purport to record, are not conclusive. See Doyle v. Mitchell Bros. Co., 247 U.S. 179; Eli D. Goodstein, supra, p. 1190, and the cases cited there. Upon the record here, the execution of the promissory note was but one component part of the sham. The promissory note did not evidence a bona fide and real indebtedness of Melcher. Rather, it was a device to give the appearance of a loan to Melcher, the appearance of an indebtedness on which he paid "interest", and the appearance of "pledging" of Land Bank bonds to Gibraltar as collateral for a "loan". Since the entire transaction was lacking in substance and was an artifice, and since no real borrowing took place, petitioners' contention that their two notes to Gibraltar represented a valid indebtedness under California law and New York law cannot be given any serious effect. There were two notes payable to Gibraltar. The first note had the appearance of utilizing a practice which is sometimes used by a bank when making an actual loan evidenced by a promissory note of the borrower, namely of collecting interest *201 on the note in advance by withholding such amount from the cash loaned to the borrower. Thus, on a loan of $50,000 at 6 percent, the bank might "prepay" to itself the interest of $3,000, pay $47,000, net, in cash to the borrower, and at the end collect $50,000 in payment of the loan. Melcher's first promissory note was in the amount of $3,156,000, which was $267,666.66 more than C-F had charged for the purported "purchase" of the bonds. There was not a payment of any cash by Gibraltar to or for Melcher at the time of the signing of the note and so $2,888,333.34 was not a cash advance by Gibraltar. The $267,666.66 was called a "reserve" in the text of the note. Gibraltar made periodic payments of cash to Melcher, pursuant to the note, between March 11, 1953, and October 1, 1955, totaling $267,666.66. Where did that cash come from? It came from Melcher in the exchanges of the checks of Melcher to Gibraltar and of the checks of Gibraltar to Melcher. The prescribed installments of note "interest" under the first note totaled $347,993.05; Melcher's checks to Gibraltar totaled that amount; and on his tax returns Melcher deducted that total sum as "interest" payments. A schedule in the findings *202 shows the effect of the exchanges of checks. For example, the note "interest" due on March 11, 1953, $17,399.65 was paid by Melcher, but since he received Gibraltar's check for $13,383.33 (a payment of part of the "reserve" of $267,666.66), the net amount paid by Melcher on this installment was only $4,016.32. Finally, although the "interest" installments totaled $347,993.05, Melcher actually made cash payments to Gibraltar of only the net sum of $80,326.39. The finding and conclusions about the first "note" to Gibraltar are that the note was a "phantom" note, a sham, and that Gibraltar did not make a loan to him of 1034 either $3,156,000, or of the "reserve" of $267,666.66. Melcher's payments to Gibraltar of "interest" did not total $347,993.05. Melcher paid Gibraltar under the first note only $80,326.39, which was not "interest" on indebtedness, but was a fee to Gibraltar for its services in providing the mechanics and facade for taking tax deductions for each year, and for the whole framework on which Melcher relies here. The exchanges of checks were merely a financial "round robin". Since no loan actually had been made by Gibraltar to Melcher, and he was not actually indebted to *203 Gibraltar, his checks to Gibraltar could not properly be regarded as payments of interest on a nonexistent loan. Broome v. United States, supra, p. 614. If the so-called "reserve" described in the first "note" had been a real reserve to cover note "interest" and a real "loan" of $267,666.66 for that purpose, the amounts of Melcher's checks for payments of installments of "interest" would not have been in the full amount of each periodic amount typed on the note, and instead his checks would have been in a net amount after allowing for a "credit" for part of the $267,666.66 "reserve" to cover part of the installments of "interest", such as, in the above example, $4,016.32 instead of $17,399.65 for the installment due March 11, 1953, and there would not have been the exchange of checks between Melcher and Gibraltar. Of course, the argument of petitioners means that the exchange of checks accomplished the same result as in the case of the ordinary, bank procedure described above, of a withholding of cash in a loan to cover anticipated interest as it became due on a note. But the procedure which was followed by Gibraltar involving the exchanges of checks had the purpose of facilitating *204 the appearance of payments by Melcher of "interest" in the gross amount of each prescribed installment, and of providing "evidence" of each payment in the gross amount for the contemplated deductions on the tax returns. The arrangement was merely another device in the mechanics devised for tax purposes, - another part of the general eye-foolery which was used. The device was ingenious, but the appearance intended for recognition cannot receive that recognition for tax purposes. And the related device of "repayment" of the "reserve" of $267,666.66, part of the face amount of the note of $3,156,000, by Gibraltar's credits of purported bond "interest" of $157,500, described above, cannot be recognized for tax purposes either, as no Land Bank bonds were acquired and no bond "interest" was received to provide those credits. As was stated in J. George Gold, supra, p. 427, each step was an "interrelated component" part "of a sham", a built-in interrelated part of a complicated but transparent artifice. The ingenuity of the design of the deceit was an interesting exercise in perverting and adapting ordinary business procedures to the form of the entire transaction so as to provide the appearance *205 of reality and commercial substance to a transaction which in its entirety and in its component parts was false and a nullity. Another device which was employed in the first "note" involved Gibraltar's bookkeeping credits to Melcher's "loan" account on its books for "interest" on the Land Bank bonds for three years, $52,500 a year, totaling $157,500 (for which no cash payments to Melcher were made), which "reduced" the principal amount of the "note" from $3,156,000 to $2,998,500. The practical reason for that step involved a preview of the closing of the transaction in Gibraltar's books by a "sale" in 1957 of the purportedly "purchased" bonds. Redeemable at par on October 1, 1957, the due date of Melcher's second note, it was to be expected that a "sale" of the bonds close to October 1, 1957, would be at a price close to $3,000,000. Obviously, a sale in September 1957, or a redemption on the redemption date would not yield more than $3,000,000, and the principal amount of the first note, $3,156,000, could not be satisfied by $3,000,000, or less. Unless the principal amount of the first note was to be "reduced" in some way, Melcher would have had to pay Gibraltar $156,000, or more, *206 when the transaction would be closed on the books. That eventuality was eliminated by the credits to the principal amount of the first note for purported bond "interest" of $157,500, and the execution of the second "note" in the amount of $2,998,500, which amount might reasonably come close to the amount for which the bonds could be "sold" close to their maturity date. According to the last step, a "sale" on September 6, 1957, the bonds were "sold" for $2,993,812.50, which left a "balance" due on the second note of only $4,687.40 (rather than $156,000 or more), which Melcher paid. In connection with these credits for bond "interest" of $157,500 (not involving any cash), Melcher reported in his tax returns bond "interest" accrued after March 11, 1953, totaling $134,166.66 (the difference of $23,333.34 being part of the "charge" for the 1035 bonds), which served to reduce the tax benefits of his deductions for note "interest", but was part of the entire plan and artifice. The first note of $3,156,000 was not evidence of an indebtedness of Melcher, but it provided the basis for opening the account in his name on Gibraltar's books with a debit entry in that amount, and it was part of the *207 paper transaction. With respect to the second note to Gibraltar dated October 1, 1955, there was the same procedure of exchanges of checks between Melcher and Gibraltar, except that under the second note, Gibraltar's cash payments were purportedly for "interest" on the bonds. Under the second "note" Melcher's checks for note "interest" totaled $109,142.42 (cash not credits), and Gibraltar's checks to him totaled $78,750 (cash not credits), so that Melcher's net cash payments of "interest" were only $30,392.42. These exchanges of checks represented another financial "round robin". However, on his tax returns, Melcher took "interest" deductions including his cash "payments" of $109,142.42, plus a credit on the books for accrued bond "interest" as of September 6, 1957, of $22,604.17, or a total of $131,746.59. The findings and conclusions are that the second "note" to Gibraltar was a "phantom" note and a sham which was not evidence of a bona fide "indebtedness", in substance, of $2,998,500. There was not an "indebtedness" in that amount which can be recognized for tax purposes. Gibraltar was utilized merely for the purpose of recording the payments of "interest" on the two notes, whereas *208 Melcher did not make payments of interest on indebtedness. Bookkeeping entries, although evidence of the facts which they purport to record, are not conclusive. Eli D. Goodstein, supra, p. 1190, and cases cited there. Moreover, petitioner, a cash basis taxpayer, did not make payments of the purported "note interest" in the amounts for which he took "interest" deductions; the deductions totaled $479,739.64 (with respect to the two notes), whereas his cash payments to Gibraltar were $369,020.83 less, and were only $110,718.81. It is noted here, as was done in Eli D. Goodstein, supra, p. 1191, that in the case of a taxpayer on the cash method of accounting, "the giving of notes to cover liability does not satisfy the statutory requirement of payment and does not permit a deduction from gross income." Eckert v. Burnet, 283 U.S. 140, and other cases cited at p. 1191, Goodstein, supra. In view of our holding that the transaction lacked substance, and that in fact no Land Bank bonds were purchased, it follows that petitioner did not receive any coupon interest on the bonds in any of the taxable years, either through Gibraltar's checks or its credits to Melcher's account, and there will *209 be eliminated from taxable income for the taxable years the items he reported as "bond interest", which totaled $235,520.83. Those adjustments are conceded by respondent and will be taken care of by the parties under Rule 50. 3. There was a purported "sale" of Land Bank bonds for petitioner's account on September 6, 1957, with total "proceeds" of $3,016,416.67, including the accrued bond "interest" of $22,604.17, and the net "sale" proceeds of $2,993,812.50. There was a purported capital gain from the transaction of $128,812.50. It is our finding and conclusion that the purported sale was a sham and was only part of the entire sham transaction. No Land Bank bonds had been purchased for Melcher's account, in fact and in substance; none had been "borrowed" by Gibraltar for a purported "short sale"; there was not in fact and in substance any "short sale" of bonds attributable to Melcher; no bonds were being held for his account; and finally, in substance and in fact no bonds attributable to Melcher were "sold" for his account on September 6, 1957. It follows that he did not realize a capital gain in the above amount in 1957, and that under Rule 50 the 50 percent of the above amount, $64,406.25, *210 which was reported in income shall be eliminated from income. Petitioners assert that Melcher did not have any actual knowledge of the mechanics of the transaction as utilized by C-F and Gibraltar, that Melcher relied upon the advice received from his attorneys, and that he did not indirectly acquiesce in the mechanics. Petitioners argue that the mechanics employed by C-F and Gibraltar were "third party" actions about which Melcher was not informed and was not obliged to investigate or ascertain. Melcher testified that the law firm of Rosenthal and Norton handled the transaction, that he did not make any independent investigation about it, that he accepted the recommendations of his attorneys and simply assumed it was a good investment. However, Melcher also testified that in the past he never had invested for his own account in a project involving as much as a million dollars. 1036 Rosenthal's testimony was limited by a refusal to disclose some of his conversations with petitioners upon his claiming the lawyerclient privilege. Samuel P. Norton's testimony about his discussions of the transaction with Melcher also was limited by assertion of the claim of confidential communications *211 between lawyer and client. Rosenthal testified that he advised petitioners about signing the promissory note dated March 11, 1953, and the renewal note; he testified that he believed he did not discuss with Melcher the "interest" expense involved. Rosenthal did not provide in his testimony any specific reasons why the transaction in the Land Bank bonds would be a sound investment for Melcher. A witness called by petitioners was Professor John P. Shelton, an economist. His testimony related to matters of investing in the Land Bank bonds. His testimony has been considered but we are unable to give it much weight. It probably is true that Melcher did not have information about the mechanics used by C-F and Gibraltar. On the other hand, his testimony indicates that he was at least aware of the fact that it was not customary for him to "borrow" as much as three million dollars or to "purchase" that amount of securities. It is obvious from the entire record that Melcher did not intend to "repay" three million dollars to Gibraltar by independently taking over the transaction at any time or by independently deciding to "sell" the bonds. Melcher did not risk any borrowed money. The record does *212 not disclose what Melcher's understanding on or before March 11, 1953, may have been, from his conversations with Rosenthal and Norton, about the tax consequences of the proposed transaction. Melcher presumably acquainted himself with the provisions in the original and renewal promissiory notes (which he signed) about the amounts he was to pay Gibraltar as "interest". Compare Eli D. Goodstein, supra, 30 T.C. 1178, 1188. Petitioners' reliance on Chamberlin v. Commissioner, 207 F. 2d 462, 471-472 (C.A. 6, 1953) is misplaced. That case on its facts is distinguishable. Here, as in Lynch v. Commissioner, supra, 780; and MacRae v. Commissioner, supra, 294 F. 2d 56, 59, Melcher's ignorance of the actual steps taken by C-F and Gibraltar, and of the mechanics employed by them, is of no avail. Even if we accept the contention that Melcher was "fooled" by his advisors, C-F, and Gibraltar the contested deductions cannot be allowed. Petitioners may deduct the amounts in question as interest only if they were in fact payments of interest on an existing indebtedness. The statutes, section 23(b), 1939 Code, and section 163(a), 1954 Code, do not by their terms permit as a condition for a deduction, *213 for interest paid on indebtedness, the taxpayer's intent, belief, "good faith", or subjective considerations. The taxpayer's "good faith" is immaterial. A matter so real as taxation must depend on objective realities, not on the varying subjective beliefs of individual taxpayers. Lynch, supra, p. 872; Perry A. Nichols, supra, p. 780. Sections 23(b) and 163(a) do not turn on "intent." See W. Stuart Emmons, supra, 31 T.C. 26, 31. Sections 23(b) and 163(a) require as the condition for allowing the deduction that the payment involved shall be for the use or forbearance of money. No matter what Melcher's intent and belief may have been upon entering into the transaction, the transaction was a sham which cannot be recognized for tax purposes and cannot be held to have given rise to valid interest deductions. Without repeating our previously stated conclusions, we again point out that the steps taken were taken pursuant to a preconceived plan which lacked substance, and lacked the reasonable possibility of appreciably benefitting Melcher's economic interests, and that it was undertaken solely to form the basis for claimed tax benefits. The purchase by C-F of $3,000,000 Land Bank bonds was *214 made only to give color to the transaction and, as the facts show, they were disposed of immediately on March 11, 1953. It is apparent that it was the intention that Melcher would not purchase the bonds, that there would not be an actual loan to him, and that he would not pay any interest. Melcher did not risk any borrowed money. In fact, Gibraltar did not risk any borrowed money. Compare, for example, Max Barnett, supra, 44 T.C. 261, 264, where Gibraltar actually borrowed $740,000 from Cleveland Trust Co. at 4 percent, gave the bank its own promissory note, and pledged government securities actually purchased with the borrowed funds. In these cases, there is no evidence that either C-F or Gibraltar were in a position to loan Melcher close to $3,000,000 with which to pay for the Land Bank bonds. Rather, bonds were to be "purchased" without having to expend money to cover the "purchase price", and without actually borrowing any money from 1037 an available source such as a bank. No bonds were purchased, except momentarily; none could be purchased without any money. C-F's purported purchase on March 11, 1953, as shown by its broker's slip, was simply reversed and nullified by Gibraltar's *215 almost simultaneous order to Childs to sell on March 11, 1953, $3,000,000 Land Bank bonds. That order to Childs was not a real and actual short sale of bonds. None of the parties had bought and paid for the bonds, and did not own any bonds to loan to Gibraltar for making a short sale. The transaction was a paper transaction, was a sham, and cannot be recognized for tax purposes. Melcher's payments to Gibraltar were in reality the net consideration paid for tax deductions, not for a loan, "and when so viewed were plainly outside the statute permitting a deduction for interest paid on an indebtedness." Gordon MacRae, supra, p. 28. Respondent's determinations disallowing the claimed deductions for interest are sustained. Petitioners contend that Melcher purported to enter into a profit-seeking transaction. The record is clear that under the circumstances, no reasonable chance existed of realizing a true profit over and above the expense of the transaction, apart from the tax-benefit feature. Shelton's testimony acknowledged that the highest market price ever attained by the Land Bank bonds was 100 1/2 in 1949, about 8 years earlier than their maturity date October 1, 1957, and 4 years *216 prior to the transaction in 1953. It is generally known that in the case of a government security redeemable at par, the market price tends to be below par and to approach par as the time comes closer to the maturity date. The evidence shows that in view of the charges of Gibraltar as "interest", and in view of the purported "holding" of them until September 6, 1957, there would have been an economic loss in 1957 even if the bonds could have been "sold" at par; and that in order for Melcher to have broken "even", in view of the amounts of his payments, the market price would have had to reach more than par, as much as 102 or 103. The reality of the transaction can be found only on the theory that apart from expected tax benefits it was a commercial undertaking for profit. That finding cannot be made. B. Claimed Loss Deduction, Section 165 (c)(2). Petitioners now seek, in the alternative, a deduction in 1957 of their out-of-pocket expense of $115,406.21 as a loss incurred in a transaction entered into for profit under section 165(c)(2). We have concluded that the transaction was a sham; that there was no actual purchase of bonds by or for petitioner; that there was no borrowing of *217 money and no genuine indebtedness; that there was no reasonable expectation of gain apart from tax benefits, or of an economic benefit to petitioner, and that Melcher's possibility of profit was illusory. It is well settled that a loss deduction for out-of-pocket expense is not allowable under section 165(c)(2), under such facts as are present here. Lewis v. Commissioner, supra, p. 639; MacRae v. Commissioner, supra, pp. 59-60. A sham transaction which was entered into with a view to obtaining interest deductions cannot be regarded as a transaction entered into for profit within the scope of section 165(c)(2). To allow a deduction for the out-of-pocket expenditures as a loss from a transaction entered into for profit would be inconsistent with our findings and conclusions that the transaction was not in substance a purchase of bonds with borrowed money, but was in reality an attempt to simulate a security transaction for the purpose of artificially creating interest deductions. It is held that a loss deduction of $115,406.21 is not allowable under section 165(c)(2). There was no reasonable probability of an appreciable beneficial effect from the transaction on Melcher's beneficial *218 interests. Cf. Knetsch v. United States, supra. C. Claimed Loss Deduction under Section 1234. [5] As another alternative, petitioners contend that Melcher's net expense of $115,406.21 is deductible in 1957 under section 1234, as a loss attributable to his failure to exercise "a privilege or option to buy or sell property." Petitioners' argument on brief is limited, cursory, and not clear. Presumably this alternative claim for a loss deduction is for a capital *219 loss deduction in 1957. Petitioners have not pointed to any provision of either the original promissory note or the renewal note as a basis for the claimed deduction 1038 under section 1234 (which in the 1939 Code was section 117(g)(2)). Petitioners cite Becker v. Commissioner, supra, 277 F. 2d 146. Respondent argues that there is no basis for the claimed deduction under section 1234 because the transaction was a sham, there was not a reasonable expectation of realizing a profit, and the transaction did not involve any option to buy or sell property. He contends that no deduction is allowable under section 1234. He relies on Lewis v. Commissioner, supra, 328 F. 2d 634, 640. It appears that petitioners claim a loss deduction under section 1234 on the theory that the transaction should be characterized as a valid and enforceable contract which resulted in a deductible loss. In Becker the court characterized the Livingstone type transaction as an option agreement under which the taxpayer could "call" for the government security (Treasury Notes) upon the payment of the debt; the court approved a deduction for the net out-of-pocket expense as a loss under section 117(g)(2), 1939 Code, which *220 corresponded to section 1234. The court concluded that the expense was a loss "attributable to the failure to exercise privileges or options to buy or sell property * * *." In Brown v. Commissioner, supra, 396 F. 2d 462, 464-467 (C. Cl. 1968), the court re-examined the availability of a loss deduction under section 117(g)(2), and concluded as follows (p. 465-466): The 1954 Code re-enactment of section 117(g)(2) is section 1234. It provides for the recognition of capital gain or loss, under specific circumstances, if a taxpayer fails to exercise an option. The recognition of a loss, however, does not establish its deductibility. In the case of an individual, a recognized loss is deductible only if it is within the explicit limitations of section 165(c). See: Morris R. DeWoskin, 35 T.C. 356 (1960). The regulations under section 1234 make this approach "crystal clear." Regulation section 1.1234-1(f) provides: (f)Limitation on effect of section. Losses to which section 1234 applies are subject to the limitations on losses under section 165(c) * * * Whether this transaction is characterized as an option contract or as a bilateral agreement (assuming that it is not a complete sham which *221 would not be viable for either legal or income tax purposes), the ultimate question is whether this purported capital loss is deductible under section 165(c)(2). This issue was not decided in either Becker or Goodstein, although in Becker a deduction was permitted under section 117(g)(2) (the capital loss recognition provision) and the dicta in both Goodstein and Lynch indicate that they are in accord. In MacRae, the court also permitted a deduction under the recognition provision but specifically denied the availability of a capital loss deduction under section 23(e)(2) (present section 165(c)(2) and the only basis for a proper deduction). Even if this is a recognized loss, it is not deductible because we find that the transaction does not meet the statutory requirements of section 165(c)(2). In Knetsch v. United States, 348 F. 2d 932, 172 Ct. Cl. 378 (1965), cert. denied, 383 U.S. 957, 86 S. Ct. 1221, 16 L. Ed. 2d 300 (1966), a closely analogous case, we discussed the basic requirements for the deduction of a loss under section 165(c), i.e., a profit-seeking purpose for entering the transaction which gives rise to the loss. The taxpayer, when denied an interest deduction for "prepaid *222 interest" by the Supreme Court 364 U.S. 361, 81 S. Ct. 132, 5 L. Ed. 2d 128 (1960)), returned to claim a section 165(c) capital loss or, alternatively, a section 212 business expense deduction for the out-of-pocket costs of an annuity contract transaction designed to create artificial interest deductions. We reaffirm our discussion in Knetsch of section 165(c). We find that, in this case, as in Knetsch, plaintiff cannot deduct this loss under section 165(c). [2] The realization and recognition of a loss does not establish the requisite profit-seeking purpose essential for a capital loss deduction by an individual under section 165(c). Plaintiff has not proved that purpose. "[Section] 165(c)(2) was not designed to be a catchall provision allowing taxpayers to deduct any out-of-pocket expenditures." ( Knetsch v. United States, supra, 348 F. 2d at 937, 172 Ct. Cl. at 385). See, also, Lewis v. Commissioner, supra, p. 640; and Morris R. DeWoskin, supra, pp. 363-364. In these cases, Melcher was precluded by the terms of the renewal note from terminating the transaction at will and at any time, thereby halting the running of "interest" on the purported loan. The renewal note did not give *223 Melcher the opportunity to terminate the transaction at any time. The renewal note contained the provision that Melcher would be required to give Gibraltar written notice of an 1039 intention to "sell" the "pledged" bonds no less than 10 days and not more than 30 days prior to the maturity date of the promissory note, which was October 1, 1957, which was the same date as the maturity of the Land Bank bonds. This factor, in our opinion, distinguishes these cases from Becker, and also from McRae v. Commissioner, supra, on this point. Section 165(c) provides limitations on the loss deduction available to an individual. Here the loss from the out-of-pocket expense of Melcher was not a loss incurred in or connected with a trade or business. Subsection (2) of section 165(c) limits the loss deduction for an individual to a loss incurred in a transaction entered into for profit, though not connected with a trade or business. We have found and concluded that the transaction was not one, when entered into, from which a profit could have been expected apart from the tax aspect. It follows that the claimed deduction under section 1234 is precluded by the limitation imposed by section 165(c)(2). *224 See and compare Jockmus v. United States, supra, where the Second Circuit may have modified its original position as stated in Becker, in its discussion of section 165(c). It has been concluded that Melcher did not have any real profit motive when the transaction was begun other than or in addition to the tax benefits which would accrue. That conclusion follows from the objective facts. Without again repeating the objective facts, we note that the circumstances show that Melcher did not expect to recover what he paid as "interest," or to obtain a profit. In the transaction there was an absence of any economic substance beyond tax deductions. The reasoning of Brown v. United States, supra, p. 467, applies here: Those same factual circumstances have no more economic reality where the out-of-pocket expense is characterized as a capital loss, in the absence of proof that the entire transaction was entered into for profit. In addition to the foregoing, we believe that the loss deduction for net out-of-pocket expense, claimed under section 1234, should be disallowed for the same reason that the deductions for interest have been denied, namely that the transaction was a sham. It was a sham *225 for the purpose of section 1234. An "option" cannot be implied or found in the transaction which would make the net expense a qualified expense for the purpose of section 1234. No bonds were in fact purchased, and no loan was in fact made. We are unable to perceive the alleged applicability of section 1234. It is held that no deduction for the net out-of-pocket expense of $115,406.21 is allowable under section 1234. Such deduction is at least precluded by the limitation of section 165(c)(2). The original note of Melcher to Gibraltar became due in October 1, 1955, but it could be renewed, and a renewal note dated October 1, 1955, was executed with the due date of October 1, 1957, the same date as the maturity of the Land Bank bonds which purportedly were pledged to secure the note. If the transaction had some status and was not a complete sham, so as to come within the reach of section 1234 (an inference with which we do not agree, and do not adopt), then we should consider whether or not the parties to the renewal note (Melcher and Gibraltar) had any intention that Melcher could "call" upon Gibraltar to deliver to him the purportedly pledged bonds upon his payment of the renewal note. *226 This possible factor had been carefully considered, especially in view of the fact that Melcher's out-of-pocket expense of $115,406.21 was large. Petitioners seek, on an alternative ground, some "tax relief" for that considerable net expense which became fixed as to amount in 1957. (Parenthetically, it may be observed that if "tax relief" is not available to petitioners, some other avenue for "relief" would have to be explored in view of the substantial cost which Melcher incurred and paid in the transaction. But this Court is not the tribunal to which some other avenue of relief might lead.) The entire evidence and all of the circumstances support the following inferences and conclusions: Melcher had never undertaken to make any investment for his own account costing as much as even $1,000,000. The evidence does not indicate any intention on his part as of October 1, 1955, to acquire and hold $3,000,000 Land Bank bonds by making a payment of the amount of the renewal note, $2,998,500. The provision in the renewal note to the effect that Melcher had "the right * * * to apply the market price of the securities pledged herein, at the date of such application to the payment of this note" *227 was "a right" of no practical significance with respect to the "pledged" Land Bank bonds due October 1, 1957. That clause was part of a printed form of a Gibraltar note which might have a practical 1040 significance where another type of collateral was pledged to secure such note. For example: That "right," by the terms of the printed note, could not be exercised any earlier than September 1, or any later than about September 20, 1957. The clause was rendered meaningless by the facts that the "pledged" collateral consisted of bonds having the same maturity date as the maturity date of the note, October 1, 1957, and the bonds were to be redeemed at par. No practical purpose would be served if Melcher might exercise his "right" under the note, between September 1 and 20, 1957, to "call" upon Gibraltar to deliver to him the "pledged" bonds upon his payment to Gibraltar of the then market value of the bonds as a payment on the note. Such step would have been an academic exercise of a "right" which would have no economic value to Melcher at all for the simple and obvious reason that 30 days later, or less, the bonds would be called and redeemed at par by the issuing Federal Land Bank. Under *228 these circumstances the only inference and conclusion which can be made is that as of the date of the execution of the renewal note the parties thereto could not have had, and did not have, any intention that the clause in the printed note might be invoked and used by Melcher. The "right" to "call" for the "pledged" bonds was in a provision of the renewal note, but it was an academic "right" which did not have any practical or economic meaning. Therefore, with respect to petitioners' alternative claim under section 1234, that "right" in the renewal note was a nullity, and it does not provide any basis for a loss deduction under section 1234. With respect to the limitation prescribed in section 165(c), we have set forth facts in the findings, in detail, which clearly demonstrate the fallacy of a contention that the transaction was entered into for profit, apart from expected tax deductions. The arrangement whereby Gibraltar was to pay and did pay $267,666.66 to Melcher out of a so-called "reserve," which increased the face amount of the note to $3,156,000, had certain advantages. The larger amount of the note increased the dollar amounts of the periodic payments of "interest" on the *229 note, and as a consequence increased the dollar amounts each year of the deductions for "interest" in the tax returns. Also, the periodic cash payments by Gibraltar to Melcher, on or about the due dates of Melcher's periodic cash payments of "interest" to Gibraltar, served to reduce the amounts of his own cash which Melcher would have to use in making the "interest" payments. Those advantages in the arrangement, however, ruled out the practical possibility of Melcher's realizing a true economic and monetary profit from the transaction. The entire arrangement was such that he could not have his cake and eat it too. The finding and conclusion are, for the purposes of the applicability of sections 1234 and 165(c)(2), that the transaction was not entered into for profit apart from tax savings. It is observed that Melcher's net out-of-pocket expense of $115,406.21 was large. So was the net out-of-pocket "cash loss" or expense in the second Knetsch case, supra, 348 F. 2d 932, 935, where the expense was $137,315. Here, as in the second Knetsch case, the loss realized by Melcher, the out-of-pocket expense, is not within section 165 (c)(2) because of the second requirement of that statute which *230 limits deductible losses to "transactions entered into for pofit." The reasoning in Knetsch, supra, pages 936-939 applies here and need not be restated. See Knetsch, 348 F. 2d 932, 938: "Therefore, the statutory word 'profit' cannot embrace profit seeking actively in which the only economic gain derived therefrom results from a tax deduction. In other words, there can be no deductible loss allowed under section 165(c)(2) if the transaction which gave rise to the loss has been determined to have been 'without economic substance' or a 'sham'." Here, the transaction could yield an economic gain to Melcher only if he succeeded in receiving the claimed deductions for interest. Moreover, the transaction lacked economic substance and was a sham. A loss deduction of the out-of-pocket expense of $115,406.21 is not allowable under sections 1234 and 165(c)(2). Petitioners were required to show that Melcher intended to realize a profit from the transaction apart from tax savings. They failed to do so. D. Procedural Matters. Consideration has been given to petitioners' contentions and arguments about certain procedural matters, but since they are lacking in merit and relevance no useful purpose *231 will be served in discussing them and outlining the rejection of them. 1041 Issue 2: Purchase of Residence; Alleged Indebtedness of $80,000; Claimed Deduction in 1956 for Purported Interest of $76,000 The ultimate question is whether there was a bona fide indebtedness of the Melchers to 250 Building Corporation in the amount of $80,000 evidenced by a promissory note payable at the end of 15 years, bearing 6 1/3 percent interest. A deduction of $76,000 was taken on the 1956 tax return as prepaid "interest" on indebtedness. The claimed deduction is allowable under section 163(a) only if there was a real and bona fide indebtedness of $80,000. The petitioners claim that their two payments to the corporation of $50,000 and $26,000, totaling $76,000, were prepayments of 15 years' interest on their note for $80,000 payable to the corporation. Arithmetically, 15 times $5,066 equals $75,990, close to $76,000. At the rate of 6 1/3 percent, the annual interest on $80,000 would be $5,066.66. Whether or not there was an actual and real indebtedness of $80,000 which can be recognized for tax purposes depends upon whether recognition can be given, for tax purposes, to the purported resale of the *232 Wallenstein property to the petitioners by the 250 Building Corporation. The questions are questions of fact with respect to which the petitioners had the burden of proof. The petitioners rely upon the form of the transaction. They contend that there were two separate transactions; that the first one was a sale of the residential property by the Wallensteins to the Connoring Corporation (later called 250 Building) evidenced by a sale contract with and a deed to Connoring; and that the second transaction was a resale of the property for $110,000 by the corporation to themselves evidenced by the deed from the corporation to themselves, and by their promissory note for $80,000, by their deed of trust to the corporation securing their note, and by their assumption of the corporation's note for $30,000 to Home Savings and Loan. The respondent argues that the circumstances, arrangements, and steps taken must be viewed as a whole, and that the purported simultaneous "resale" of the property by the corporation to the petitioners was a sham transaction devised to provide the basis for a deduction for "interest" in the amount claimed. Respondent contends that the purported resale for $110,000 *233 was not a bona fide, arm's length transaction, that it was devoid of all commercial reality, that the corporation was controlled by the petitioners and their attorneys, Rosenthal and Norton, and that there was not a bona fide indebtedness of the petitioners to the corporation for either $110,000 or $80,000. The general question under this issue is an example of the now venerable and basic rule of Gregory v. Helvering, supra, which is that it cannot be doubted that a taxpayer has a legal right to decrease the amount of what otherwise would be his taxes, "or altogether avoid them", if he employs means "which the law permits." However, here, as in hundreds of cases prior to these, "the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended." (Emphasis added.) Section 163(a) of the 1954 Code, and its predecessor provisions in the earlier 1939 Code, section 23(b), and in the prior revenue acts contain the clear requirement that to be deductible that which is "paid" must be "interest on indebtedness". The issue under consideration, involving the purchase of the Wallenstein property, encompasses so many well established rules *234 of tax law that the impression is inescapable that the petitioners' advisers, who must have been the architects of the devices employed, utilizing a controlled corporation for a taxmotivated plan, either were unacquainted with the decisions in cases holding that similar transactions were so lacking in substance, good faith, and arm's length dealing that such transactions could not be recognized for tax purposes, or they chose to ignore those decisions which have applied the reasoning of Gregory v. Helvering and have looked through form to the substance of controlled and artificial transactions. The facts about the steps followed involving the Wallensteins' sale of the real estate and the employment of the controlled corporation, Connoring-250 Building, are such that it appears that those who devised the entire plan simply disregarded the rule of Gregory v. Helvering (1935) to the effect that a statutory provision shall not be deprived of its serious purpose by exalting "artifice above reality". There was a bona fide sale by the Wallensteins for a negotiated price of $85,000. Melcher, Norton, and the Wallensteins' agents negotiated the sale. The fair market value of the property was *235 fixed at that sale price. The purported "resale" by the controlled corporation to the Melchers, stockholders, about one month later for $25,000 1042 more, their execution of a 15-year "promissory note" for $80,000, and the simultaneous "closings" represented a blatant artifice. The purported "resale" by the corporation to the Melchers and their alleged "prepayment" of "interest" on $80,000 for 15 years in the amount of $76,000, close to the full amount of the "promissory note", was devoid of substance, commercial realism, good faith, arm's length dealing, external evidence of value, and ordinary common sense, in view of the simultaneous sale by the Wallensteins for $85,000. The purported "resale" for $110,000, employing petitioners' "note" for $80,000, constituted a transparent, tax-avoidance subterfuge. The purported "resale" by 250 Building Corporation to petitioners was so lacking in substance and bona fides that the petitioners' contentions should be disposed of simply upon the Findings of Fact, with no discussion except that petitioners' contentions are wholly lacking in merit. The findings and conclusion are that there was not a bona fide resale of the property for $110,000 *236 to the petitioners by 250 Building Corporation. There was not a real and true indebtedness of the petitioners to the corporation of $80,000. The payments of petitioners to the corporation totaling $76,000 were not a "prepayment" of 15 years' "interest on indebtedness" within the intendment of section 163(a). It is clear beyond any doubt that to sustain the petitioners' contentions and to allow the claimed "interest" deduction of $76,000 would exalt artifice above reality and would deprive section 163(a) of its serious purpose. Such determination also would represent a violation of the primary principle that tax deductions are a matter of legislative grace, and a taxpayer seeking the benefits of them must prove and establish that a claimed deduction comes within the provisions and intendment of the applicable statutory provision. The findings and conclusions are that the Connoring corporation was merely a conduit through which the petitioners purchased from the Wallensteins their property for $85,000 in an arm's length transaction which established the fair market value of the property to be $85,000 and no more; that there was only one bona fide transaction, namely, the purchase of *237 the property by the petitioners for $85,000, plus the agreed payment of the real estate brokers' fees of $4,250. In fact, the petitioners paid to the Wallensteins, through the escrow in the name of Connoring, $50,000 of the sale price of $85,000. Looking through the form of the transaction to the substance, the further facts are as follows: The purchase-money loan of $30,000 from Home Savings and Loan, secured by a first, purchase-money mortgage, was borrowed for the benefit of the Melchers, who assumed that indebtedness. Connoring advanced $5,000, as a deposit to bind the sale contract, for the Melchers who later repaid that amount when they paid the corporation $26,000. Thus, the Melchers, through the escrow and through Connoring paid $85,000 in cash to the Wallensteins. The costs to the Melchers in acquiring the property through the escrow totaled $5,236.80, which amount was paid by Connoring into the escrow and, later, was repaid to the corporation by the Melchers when they paid the $26,000. The costs were brokers' fees, $4,250; fee for mortgage loan $300; cost of termite control $365; and miscellaneous charges incident to obtaining the title deed through the escrow, recording *238 fees, etc., $321.80. The Melchers repaid the corporation on October 23, 1956, out of $26,000, the sum of the above advances, $10,236.80 ($5,000 and $5,236.80). The balance of their payment to the corporation of $26,000 was $15,763.20. Our finding and conclusion are that the latter amount was in fact a fee to the corporation for its services in providing the facade and mechanics for the purported second "resale" transaction, for the purported "indebtedness" of $80,000, and the basis for the appearance of a prepayment of 15 years' interest of $76,000 on an alleged indebtedness of $80,000. The fee was paid with the expectation of obtaining a tax benefit. Petitioners also paid $71 for certain charges in the escrow account in their name. Their expense was $15,834.20 for their attempt to reduce their 1956 tax by an anticipated tax benefit. Knetsch v. United States, supra. The petitioners do not concede the above construction of the evidence. Under their contention that there were two separate transactions, it is in effect their theory that on September 25, 1956, they entered into an oral agreement to purchase the property from Connoring; that they made a payment on account of $50,000 to *239 the corporation as "prepaid interest" on their note for $80,000; and that the corporation then used the $50,000 in its purchase of the property from the Wallensteins. It also appears to be part 1043 of petitioners' contention that there were two separate transactions, that Connoring was using its own funds in paying the $5,000 deposit, the $4,250 brokers' fees, and the costs of $986.80. Petitioners do not concede that they reimbursed the corporation with $10,236.80 when they paid it $26,000 on October 23, 1956. The opposing contention of the respondent that in substance there was only one transaction involving the real estate has necessitated close scrutiny of the steps taken and of all of the evidence. Once the finding and conclusion are made that there was in substance only one transaction, rather than two, which we have made, it then becomes evident that the payments by the Melchers of $50,000 and then $26,000 were payments towards the purchase price of $85,000, and payments of the costs, as set forth in the findings. It should be noted that the findings follow from the conclusion that there was only one transaction and that there were not two transactions. The petitioners did not *240 stipulate or agree at the trial that their two payments to the corporation of $50,000 and $26,000 were applied to the payment of the purchase price of $85,000, and to the costs of acquiring the title deed through the escrow in the sum of $10,236.80. The conclusion that in substance there was only one transaction involving the real estate, the acquisition of the title deed by the Melchers from the Wallensteins, through Connoring and through one escrow (in substance) must be made because of the following facts and due to lack of evidence about certain matters, as discussed later; which are set forth in the Findings of Fact. Because of the following considerations it is held that the evidence does not support petitioners' contention that there was a second sale or "resale" of the property by the corporation to themselves under an agreement made by those parties on about September 21 or 25, 1956, and their contention is rejected. The price of $85,000 for the property agreed upon on August 13, 1956, was a negotiated price worked out by the real estate brokers employed by the Wallensteins and Samuel P. Norton, an attorney for the Melchers, who also was a stockholder and a member of the board *241 of directors of Connoring. The real estate broker, Adamson, met with Melcher, Norton, and a second broker. Trynes, at Norton's law office. Norton made an offer of $85,000 for the property. Adamson had stated previously that he was offering the property for from $95,000 to $92,500. There was an arm's length negotiation by independent parties which resulted in a sale at the price of $85,000. The fair market value of the real estate was determined to be $85,000, the price at which each party, neither one being under any compulsion, would make the sale and purchase. With respect to the purported "resale" of the property by the corporation to the petitioners, the situation was entirely different. As far as the evidence shows, there was not a contract of sale between the corporation and the Melchers on about September 21 or 25, 1956. There is no evidence that there was any actual negotiation at arm's length by the corporation and the Melchers so as to arrive at a resale price of $25,000 more than $85,000, or $110,000. There is no evidence that within 43 days after August 13, 1956, the fair market value of the property had increased by $25,000 or any other amount. On the other hand, there *242 is evidence that Rosenthal, Norton, and Melcher, as the majority of the board of directors of Connoring and as the owners of a total of 50 shares of its stock, exercised control of Connoring. The minutes of a directors' meeting on August 11 show that a resolution was adopted authorizing a sale of the property in question by the corporation on such terms as would be agreed upon by the corporation's officers and a prospective purchaser; and that Melcher, Norton, and Rosenthal attended that meeting. Absent evidence to the contrary, the only inference and conclusion are that the "resale" price of $110,000 was an arbitrary price which was not the result of any negotiation and arm's length bargaining between Melcher, as a "purchaser", and the corporation's officers as the "seller", and that the parties to that plan were not independent parties dealing at arm's length, as is the business procedure of independent parties, neither one under any compulsion, who actually negotiate a real estate transaction. Moreover, there is no evidence that 43 days after the August 13 negotiations of Adamson, Trynes, Norton, and Melcher, when a sale and purchase price of $85,000 was negotiated at arm's length, *243 the market value of the property was any more than $85,000 on or about September 25, 1956. Therefore, the conclusion is inescapable that the so-called resale price of $110,000 was an arbitrary price, arrived at by the officers of a controlled corporation in a transaction with a stockholder and director 1044 of the corporation; that it was not a negotiated price, bargained for at arm's length by independent parties; that it was not the fair market value of the property; and that there was no substance to the purported "resale" of the property by the corporation to Melcher for $110,000. The reasonable inference, from the evidence and the lack of evidence, is that the arbitrary figure of $110,000 was a contrived figure chosen for some purpose other than an arm's length, bona fide sale of the property, and that $110,000 represented a device to provide the basis for a promissory note of the Melchers for $80,000, which in turn would provide the basis for a purported prepayment in 1956 of $76,000 of interest on such note, for which petitioners would take an "interest" deduction. To studiously spell out the above would appear to be unnecessary in view of the general facts and circumstances. *244 The above are crystal-clear. It cannot be found and concluded that there was a bona fide "resale" of the real estate by the corporation for $110,000 to the Melchers, and we reject that contention of the petitioners. There was no business and commercial reality and no substance in the purported resale of the property by the corporation to the Melchers. We are required to look through mere form to determine whether there was any substance to the purported "resale". The answer is "No". The reasoning of Gregory v. Helvering applies here. The question for determination is whether what was done in the alleged "second transaction" of a "resale", apart from the tax motive, gave rise to a bona fide indebtedness of $80,000, evidenced by a bona fide promissory note, within the intendment of section 163(a). If the purported second transaction in the form of a "resale" at a higher price, necessitating a promissory note of the petitioners, was merely a disguise for concealing a device for obtaining a deduction for "interest" in a preconceived plan which did not in fact and in substance involve a bona fide sale of the real estate in an arm's length transaction, then it follows that no recognition *245 for tax purposes can be given to the form employed or to the purported "resale" by the corporation to the petitioners. The conclusion must be made that the purported "resale" for $110,000 was nothing more than a contrivance to obtain a tax benefit, and that it was a sham. The promissory note for $80,000 and the second mortgage would be real in a bona fide transaction, but here they only deceived the eye in an artificial arrangement. The sham and artifice of the purported second "sale" of the property, involving a "note" for $80,000, are shown by the "prepayment" of 15 years' "interest" of $76,000. Apart from a tax avoidance plan, a reasonably prudent person engaged in business, or a prudent purchaser of real estate for his personal use, would not incur an indebtedness of $80,000, if he had $76,000 on hand; and he would not incur such indebtedness and almost immediately make a payment of $76,000, not as a payment of most of the "indebtedness" itself, but as a "prepayment" of "interest" for 15 years, allowing an "indebtedness" of $80,000 to remain outstanding. Apart from the hoped-for tax benefit for 1956 of taking a deduction of $76,000 for "interest", the petitioners could have purchased *246 the property for $85,000, plus $4,250 for the brokers' fees. Or, if their transaction with the 250 Building Corporation had been a bona fide real estate transaction, the petitioners would have applied their $76,000 in cash as a down payment on the purchase price, leaving only a second mortgage indebtedness of $4,000. Assuming for purposes of argument only, that the petitioners would enter into a bona fide, arm's length transaction to purchase the property for $110,000, the prepayment of 15 years' note interest, $76,000, would increase the cost of the property to the petitioners to $186,000. When it is recognized that the petitioners could have purchased the property directly from the Wallensteins for $85,000, plus $4,250, or $89,250, the purported "resale" by the corporation involved an economic detriment to petitioners of $96,750 ($186,000 less $89,250). This amazing and incredulous arrangement became even more bizarre soon after title to the property was tranferred to petitioners. In December 1956, the petitioners created a trust for Terrance Melcher; they transferred $12,000 to the trust; and soon after, the trustee, Rosenthal, "purchased" the Melchers' note for $80,000 from the *247 corporation for $12,000. We need not describe the gift tax aspects of that transaction. The clearly evident purpose of the purported "resale" for $110,000 to the petitioners was to provide the framework for a tax deduction of $76,000 as "interest" on 1045 an indebtedness of $80,000. The facts and the circumstances require the application here of the rule that the entire transaction must be considered, and that we may not fragmentize it into the two purported transactions which the petitioners would have us do, Gordon MacRae, supra, p. 26-27. As was said there, "The choice of the more complicated and involved method of doing nothing had no purpose save the erection of the facade upon which petitioners now seek to rely." In reality and substance, the petitioners purchased the real estate for $85,000, plus $4,250, from the Wallensteins through Connoring, their agent. There was only one transaction, only one purchase, through which the petitioners received title to the property at a cost of $89,250, plus expenses of $986.80. The purported acquisition by the corporation and its alleged "resale" to petitioners was a sham. Respondent's determination is sustained. See Knetsch v. United States, supra; *248 Rothschild v. United States, 407 F. 2d 404, 409-411; Gilbert v. Commissioner, 248 F. 2d 399; Griffiths v. Helvering, 308 U.S. 355; Higgins v. Smith, 308 U.S. 473; Bazley v. Commissioner, 331 U.S. 737; Diggs v. Commissioner, 281 F. 2d 326; Guterman, Substance v. Form in the Taxation of Personal and Business Transactions, N.Y.U., 20th Institute on Federal Taxation 951 (1962); and Brown, et al. v. United States, F. 2d (U.S. Ct. Cls., May 15, 1970). Petitioners have cited and relied upon John D. Fackler, 39 B.T.A. 395 (1939). The rule of the Fackler case does not apply here. In Fackler, it was agreed by the parties that a payment was in fact a prepayment of interest on indebtedness. The parties here have not so agreed, and we do not have in these cases the issue which was decided in Fackler. With respect to the citation of Fackler by the petitioners, it is noted that the pleadings in these cases do not raise a question under section 446(b) relating to distortion of income and accounting methods. The respondent did not disallow the deduction of $76,000 on the ground that a deduction of prepaid interest for 15 years in the year of payment does not result in a clear reflection of income *249 for the taxable year of the payment. Cf., Rev. Rul. 68-643, 1968-2 C.B. 76. The rule is that consideration will not be given to questions not raised by the pleadings. John W. Furrow, Jr., 34 T.C. 931, affd. 292 F. 2d 604; Camp Wolters Enterprises, Inc., 22 T.C. 737, affd. 230 F. 2d 555. Under Issue 1, the respondent has conceded that if the Federal Land Bank bonds transaction was a sham, the petitioners did not realize any income from interest on bonds or from capital gain, and that such "income" as was so reported shall be excluded from taxable income under Rule 50 computations. Therefore, recomputations of the deficiencies will be made by the parties under Rule 50. Decisions will be entered under Rule 50. Footnotes
1. See Jerome B. Rosenthal and Ruth B. Rosenthal, T.C. Memorandum Opinion 1970-332, filed November 30, 1970.↩
2. See Samuel P. Norton and Beatrice Norton, T.C. Memorandum Opinion, 1970-229,, filed September 30, 1970.↩
3. Footnotes to schedule: ↩
1. Net difference between bond "interest" for 1953, $52,500, and accrued bond interest on 3/11/53, $23,333.34 included in total amount "charged" for bonds on "purchase" slip of C-F to Melcher. On its books, Gibraltar credited $52,500 bond "interest" for 1 year to the principal amount of Melcher's note. ↩
2. Bond "interest" for 1 year credited on Gibralter's books to principal amount of Melcher's note. ↩
3. Second note, 11/1/55, called for "interest" on note of $68,590.68 for 1 year. Gibraltar's check for $52,500 was purported bond "interest". For 1957, the "interest" on the note was $63,155.91. Gibraltar's check to petitioner and a credit for bond "interest" totaled $48,854.17. 4. For 1957, petitioner reported in taxable income, 50 percent of capital gain from "sale" of bonds, $64,406.25, and Gibraltar's payment and credit for bond "interest" of $48,854.17, a total sum of $113,260.42, which exceeded the deduction for note "interest" by $50,104.51.↩
4. SEC. 23. DEDUCTIONS FROM GROSS INCOME. * * * (b) INTEREST. - All interest paid or accrued within the taxable year on indebtednes, * * * SEC. 163. INTEREST. [1954 Code] (a) GENERAL RULE. - There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.↩
5. Section 1234. Options to Buy or Sell (a) Treatment of Gain or Loss. - Gain or loss attributable to the sale or exchange of, or loss attributable to failure to exercise, a privilege or option to buy or sell property shall be considered gain or loss from the sale or exchange of property which has the same character as the property to which the option or privilege relates has in the hands of the taxpayer (or would have in the hands of the taxpayer if acquired by him). (b) Special Rule for Loss Attributable to Failure to Exercise Option. - For purposes of subsection (a), if loss is attributable to failure to exercise a privilege or option, the privilege or option shall be deemed to have been sold or exchanged on the day it expired.↩